**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **1. RODNEY JONES,**<br>**2. JOHN McINTOSH,**<br>**3. MARCUS BALL,**<br>**4. KELLY JORDAN, and**<br>**5. ANTHONY TAYLOR,**<br>**On Behalf of Themselves and All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**1. PIPELINERS LOCAL 798 OF THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO,**<br><br>**Defendant.** | ) | **Case No. 4:20-cv-00585-CRK-CDK**<br><br>**JUDGE Claire R. Kelly** |

**THIRD AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Rodney Jones, John McIntosh, Marcus Ball, Kelly Jordan, and Anthony Taylor (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, submit the following Third Amended Complaint pursuant to the Court's Order of May 25, 2023, and state the following for their claims against Defendant Local 798 of the United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada AFL-CIO ("Local 798," "Defendant," or the "Union"). Plaintiffs

make their allegations based on their own knowledge, or on information and belief based on their attorneys' investigation.

## PARTIES

### A. Plaintiffs

1. Plaintiff Rodney Jones is a Black man and a resident and citizen of Ellenwood, Georgia. Mr. Jones has been a member of Defendant Local 798 since on or about November 11, 2005.

2. Plaintiff John McIntosh is a Black man and a resident and citizen of Cincinnati, Ohio. Mr. McIntosh has been a member of Defendant Local 798 since in or about November 2008.

3. Plaintiff Marcus Ball is a Black man and a resident and citizen of Sallis, Mississippi. Mr. McIntosh was a member of Defendant Local 798 from in or about 2008, until he resigned from the Union in or around July 2022.

4. Plaintiff Kelly Jordan is a Black man and a resident and citizen of Irontown, Pennsylvania. Mr. Jordan has been a member of Defendant Local 798 since in or about September 2007.

5. Plaintiff Anthony Taylor is a Black man and a resident and citizen of Nashville Tennessee. Taylor has been a member of the Local 798 since 2007.

### B. Defendant

6. Defendant Local 798, which is headquartered in Tulsa, Oklahoma, is a member organization of the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO.

7. Defendant Local 798 is an unincorporated association of participating employees which deals with employers, including through collective bargaining, concerning terms and conditions of employment.

8. Defendant Local 798 is a labor organization engaged in an industry affecting commerce.

9. According to its website, Defendant Local 798 is a trade union that provides the highest quality of pipeline Welders to contractors across the country. Defendant Local 798 represents individuals with a high skill level who weld together the various sections of oil and gas pipelines. In addition to the nearly 3,100 skilled Welders that are a part of Defendant Local 798, it also represents more than 650 Journeymen Spacers who assist in lining up the pipe and completing the hydrostatic testing of the pipeline and over 3,200 Helpers who assist the Welders in the weld completion process. These tasks are critical to the integrity of the pipeline and the safety surrounding the project.

**JURISDICTION AND VENUE**

10. This Court has personal jurisdiction over Defendant Local 798 because Defendant transacts business in this District.

11. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, namely Title VII and Section 1981.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3), in that the conduct giving rise to the claims herein occurred within this District and Division, and the unlawful employment practices alleged herein have been committed in this District and Division.

13. Plaintiff Rodney Jones exhausted administrative remedies as to his Title VII claim, on behalf of himself and all potential Class members, by timely filing a Charge of Discrimination with the United States Equal Employment Opportunity Commission and timely filing suit following receipt of a Notice of Right to Sue.[1]

## FACTUAL BACKGROUND

### I. Relevant History of Discrimination

14. Labor Unions in the United States, including Local 798, have a history of racial discrimination. This history is relevant to the question of present, intentional race discrimination. *See North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) ("*Arlington Heights* directs us to consider 'the historical background of the decisions' challenged as racially discriminatory….").

#### *A. History of Discrimination in Labor Unions in the United States.*

15. Racial discrimination in and amongst craft unions, and the fight against it, is as old as the craft unions themselves and "date from the early days of the American Federation of Labor, which was founded in 1886."[2]

16. For well over a century, craft unions have used various strategies to make and keep their membership as White as possible including, but not limited to, requiring

---

[1] Plaintiffs reserve their rights to seek leave to amend their pleading to add additional claims when the administrative exhaustion process is completed.

[2] See Exhibit 1, II Richard L. Worsnop, *Racial Discrimination in Craft Unions, in* EDITORIAL RESEARCH REPORTS 1969, at 877-96 (1969), http://library.cqpress.com/cqresearcher/cqresrre1969112600.

union applicants to take an admittance exam where white applicants passed "regardless of how they scored, while failing nearly every Black applicant."[3]

17. While this type of purposeful exclusion is not exclusive to craft unions, it has been recognized for decades as more prominent within them. [4]

18. Unlike industrial unions, which derive their power from admitting all to their membership, craft unions derive their bargaining power "by controlling the entrance of new workers to a trade or by monopolizing a strategic occupation." *Id*.

19. Craft unions have used a myriad of explicit and implicit means to accomplish these goals including the open exclusion of persons based on race or gender, the firing of workers based on race or gender, preventing workers from obtaining membership books based on race or gender, declining membership requests based on race or gender, and engaging in the practice of using racial and sexist slurs—all of which Local 798 has been previously found to purposefully engage in by the United States District Court for the Northern District of Oklahoma.[5]

20. The disease of racism in craft unions is not simply a plague of the past, though–in 2017, the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") published an 80-page report detailing the past and present

---

[3] See Exhibit 2, Watson, Travis. "Union Construction's Racial Equity and Inclusion Charade." *Stanford Social Innovation Review*, 2021. https://doi.org/10.48558/0H5R-CX76.

[4] See Exhibit 3, Race Discrimination in Trade Unions - Herbert R. Northrup, Commentary Magazine

[5] See *E.E.O.C. v. Loc. 798 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, AFL-CIO*, 646 F. Supp. 318, 325 (N.D. Okla. 1986).

reality of racial discrimination in the labor movement and, more specifically, within the AFL-CIO.[6]

### B. Defendant Local 798's History of Overt Race Discrimination

21. Defendant Local 798 has a long history of discrimination against Black individuals and women.

22. For the first 40 years of its existence, until the mid-1980s, Defendant Local 798 had no Black or women members, pursuant to an explicit, exclusionary policy. Defendant Local 798's membership was exclusively White men.

23. Nepotism was the primary means of membership recruitment within Local 798 for over four decades. This resulted in a membership of exclusively White men, who looked like the current members, who were all White men. From the 1970s through the 1980s, most new members were men, and relatives of existing members. Members were only permitted to recruit relatives, *e.g.*, cousins, brothers, sons, nephews, sons-in-law and/or uncles, who were also White men. No women relatives were permitted to be recruited for membership. For decades following Defendant Local 798's formation in 1949, there was an unwritten practice that if a business agent or welder foreman hired a woman or Black person for work on the pipeline, that agent or foreman would be fired.

24. EEO-3 reports prepared by Defendant Local 798 for the following periods reflect that Local 798 did not have any Black or women members as of these dates:

---

[6] See Exhibit 4, AFL-CIO Labor Commission on Racial and Economic Justice Report, 2017, generally.

September 22, 1977; July 18, 1979; July 10, 1980; May 12, 1982; June 10, 1983; April 20, 1984; and February 12, 1985.

25. In light of this racist, misogynistic history, in the mid-1980s, the United States Equal Employment Opportunity Commission ("EEOC") sued Defendant Local 798 for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq*. In an opinion reported at 646 F. Supp 318 (N.D. Okl. 1986), the U.S. District Court of the Northern District of Oklahoma made the following conclusions of law:

a. Since at least July 2, 1965, Local 798 has engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e-2, by discriminating against Black people and/or women on the basis of race, color and sex by excluding Black people and women from membership and failing and refusing to refer Black people and women for employment.

b. Local 798 has engaged in intentional discrimination resulting in disparate treatment of Black people and women. The policies and practices of Local 798 have had a discriminatory effect resulting in disparate impact on Black people and women.

c. Local 798's membership and referral practices are in violation of Title VII in that Local 798 regularly and purposefully treats Black people and women less favorably than White men.

d. Between 1976 and 1985 Local 798 had a policy of excluding Black people and women that was announced openly at its membership meetings.

e. Local 798 had a policy of firing women when non-union contractors were taken over who had women employees on the pipeline.

f. Local 798 had a policy that business agents and welder foremen were to decline requests by Black people and women for membership in the union.

g. Officials and officers of Local 798 had a practice of using racial and sexist slurs.

h. There is overwhelming evidence that a discriminatory purpose has been the motivating factor in the membership and referral practices of Local 798.

i. Local 798 engaged in a system-wide pattern and practice of employment discrimination for no legitimate justifiable business necessity.

j. In pursuing its exclusionary and nepotistic policies, Local 798 engaged in a pattern and practice of discrimination on the basis of race and sex in its membership and referrals.

k. Local 798's reputation for excluding Black people and women has had a chilling effect on applicants. Women and Black candidates were chilled (or deterred) in their desire to apply for membership.

l. The evidence establishes liability by Local 798 in violation of Title VII. Local 798 has practiced blatant discrimination over an extended period of time. The evidence shows that Local 798 has consciously and intentionally prevented women and Black people from becoming members, and from effectively participating as welder or welder helpers in the pipeline industry.

m. The court finds for the Equal Employment Opportunity Commission and against Defendant Local 798, on its claim for liability under Title VII and that Defendant

Local 798 is engaged in unlawful employment discrimination based on race and sex in its membership and referrals.

26. Unfortunately, this ruling did not cause Defendant Local 798 to stop discriminating against minorities and women. It merely caused Defendant Local 798 to change the way it engaged in such discrimination.

**C. Other Litigation Challenging Discrimination Within Local 798**

27. In *Adams v. Pipeliners* 798, 699 P.2d 343 (Alaska 1985) plaintiff filed suit against Local 798 in the Superior Court of Fairbanks Alaska, alleging that Black Helpers were excluded from the Union's out-of-work list, resulting in failure to hire Black members for work on the Trans-Alaska Pipeline on an equal basis with White Union members.

28. The case was a consolidated class and individual action brought before the Alaska State Commission for Human Rights, which found that the Union committed racial discrimination from 1975 through 1977 during the construction of the Trans-Alaska Pipeline.

29. The Union was ordered to cease discriminating against Black individuals in dispatching Helpers to jobs in Alaska and in admitting individuals working in Alaska to membership in the Union, including through imposition of a quota to allocate a certain percentage of Union jobs to Black members.

30. On appeal, the Union challenged the quota.

31. Ultimately, the efforts of the Alaska Human Rights Commission failed as the Union continues to discriminate against and harass black individuals.

32. In *Buggage v. Michels Corp., Pipeliners Local 978, and Enbridge Energy Co., Inc.,* No. 2:14-cv-00084-SPM (E.D. Mo.), Plaintiff Edward Buggage, a Black Union member alleged that Local 798 treated White employees and White disabled employees better than him.

33. Buggage specifically alleged that he was a Black man, and was regarded as disabled because he wore braces when performing his job. He alleged that he was given a failing score on a welding test and was refused the opportunity to watch others taking their welding test or to retake the welding test, while White employees were allowed to do so.

34. Buggage alleged that he filed a grievance after he was terminated from his job, and that the Union failed to represent him in the grievance.

35. Buggage alleged that after becoming reemployed and passing the inspection for an Automatic Welder on a Main Line, younger, White employees who did not wear braces or have injuries were assigned to a more favorable mini crew. He alleged he was denied the opportunity to take welder qualification tests and was denied extra time to fix a weld during an inspection, while White Welders were given these opportunities.

36. Buggage alleged that he was often called on to fix the welds of other employees. When Buggage was confronted over a bad weld caused by a Journeyman's error and requested permission to fix the weld, he was allowed to fix the weld, but was then terminated.

37. Younger, White welders who were not regarded as disabled made more severe welding mistakes but were not fired.

38. Buggage again sought the assistant of the Union over his job termination and the Union refused to represent him.

39. These facts were found to support a Section 1981 and Title VII claim against the defendant Union.

40. In *Adams v. Minnesota Limited, Inc. and Pipelines Union Local* 798, No. 08CV5238 ADM/SRN, Charles Adams, a Black Union Member filed suit against the Union and Minnesota Limited, alleging race discrimination

41. Adams alleged he was subjected to racial jokes and negative comments on his behavior. This included an incident where a White co-worker made a noose and told Adams that he had never hung anyone, but that Adams would be his first.

42. Adams alleged that he opposed the discriminatory conduct, reporting to his Union Stewards, but the Union did nothing to help him and he was terminated from his employment.

43. Adams also alleged that the Union engaged in a continuing pattern of retaliatory conduct towards Black members in failing to assign work, assigning less desirable jobs and job locations, and permitting discriminatory comments, racially themed jokes, and threats and intimidation based on race.

**II. Local 798's Discrimination Continues to This Day.**

44. Plaintiffs have outlined 4 separate lawsuits which demonstrate that Local 798 has an ingrained history and past of discrimination against Black members. In the 1970's, 1980's, and 2000's the union has been sued for its conduct. Two of these matters are class actions. On information and belief, there are more suits out there with similar allegations

challenging Local 798's pattern and practice of discrimination against Black members and candidates.

45. Further, these suits demonstrate that the direct cause of the Union's conduct and different treatment of these workers was their race – Black as opposed to being White.

46. Further, All Elected Officers for Local 798 are White and have always been White. All Business Agents for Local 798 are White and have always been White. All Dispatchers for Local 798 are White and have always been White. All Organizers for Local 798 are White and have always been White. *See* Exhibit 5, Union Print Out.

47. While working at the Michel's plant in Randolph County, Missouri, Union Business Agent Wallace, a White man, came to a Union meeting and told the members that the Union had been hit with sixteen lawsuits in the year 2014 alleging racial discrimination.

48. In all instances described herein, the Union Stewards, Business Agents, Organizers, Foreman, Supervisors and Management knowingly and intentionally violated Title VII and Section1981 by:

a. Refusing to promote Black members to Welder or Journeyman Spacer because of their race;

b. Alternatively, using a facially neutral promotion policy, that adversely affects Black members;

c. Denying Black members the benefits of equal terms and conditions of employment, including but not limited to, in relation to training, compensation, overtime, job assignments, termination, and layoff because of their race;

d. Subjecting Black employees to a hostile working environment because of their race;

e. Refusing to protect Black members from race discrimination;

f. Refusing to enforce the anti-discrimination provisions of the collective bargaining agreement on behalf of Black members in the same manner as it enforces the agreement for the benefit of White members;

g. Refusing to report or remedy illegal and discriminatory conduct against Black members in the same manner as it does for White members;

h. Refusing to pursue grievances on behalf of Black members in the same manner as White members;

i. Refusing to allow Black members to attend training in the same manner as White members;

j. Refusing to compensate Black members for time spent undergoing work related training;

k. Refusing to reimburse or cover the cost of work-related training for Black members;

l. Refusing to allow Black members the opportunity to bid on or compete for the competitive or preferred jobs;

m. Refusing to post all Union jobs on the Union jobs board thereby preventing Black members from knowing about and bidding on these jobs;

n. Refusing to allow or interfering with Black members running for or acquiring leadership positions within the Union.

o. Exposing Black Members to a direct threat of harm and physical violence by White Members based upon their race and membership in a protected class.

49. In all instances described herein, the facts demonstrate that the their status as Black Union Members caused the Union Stewards, Business Agents, Organizers, Foreman, Supervisors and Management to knowingly and intentionally treat them differently than White Members and that their race was the intentional and direct cause of the treatment and harm these men suffered. But for these men being Black, the Union would have protected them because the Union protects White people, it does not protect Black people either historically or today.

**A. Local 798 Fails To** Enforce **Anti-Discrimination Policies**.

50. When members of Local 798 are hired to work a particular job, the Union and the employer agree to operate under a collective bargaining agreement ("National Pipeline Agreement" or "CBA").

51. The CBA contains a non-discrimination provision that states: "Employer and Union agree that neither of them shall take any action or refuse to take any action which shall discriminate against any individual with respect to his compensation, conditions, or privileges of employment because of the individual's race, age, color, religion, sex, national origin or disability."

52. While a union member may have a different employer bound to this Agreement on each job, Local 798's requirement to follow these provisions follows every job the Union member works.

53. If a Union member becomes aware of violations of the CBA, including its non-discrimination provisions, he can report the violations to the employer's on-site representative – the Foreman – and Local 798's on-site representative – the Steward. Considering Defendant Local 798's history, it is not surprising that little to nothing is done by Defendant Local 798's Stewards when Black members report incidents of racial discrimination or the union otherwise becomes aware of such discrimination.

54. This following is a list of examples of racist conduct which violates the CBA and occurred on job sites worked by Local 798 Union members. The Steward was aware or should have been aware of each of these incidents, yet did nothing to address or otherwise act to enforce the CBA on behalf of Black members. This conduct is similar and is a pattern and practice of conduct which occurs across the United States at Local 798 job sites and is routinely ignored and swept under the rug, while Black members are put in harm's way and White members continue working and getting promoted:

a. The word "Nigger" or "Nigga" has been written or carved into the doors and walls of portable restrooms or restroom stalls used by the Members or Stewards at Local 798 job sites across the county. This conduct is frequent, open, notorious, and not punished, investigated, addressed or stopped. In fact it is viewed by the non-Black members and Stewards to be funny and just part of working for the Union and ordinary hazing.

b. When Black Members are injured on the job treatment is denied or delayed while White Members are allowed immediate treatment and time off.

c. When White Members start fights or participate in fights they are allowed to remain on the job while Black Members are laid off or kicked out of the Union.

d. When White Members make mistakes in job performance they are offered training or retraining while Black Members are fired.

e. When White Members make a claim of Constitution or By Laws Violations, the Stewards will file charges and pursue the claims while Black Members claims are ignored and not prosecuted.

f. When White Members are late to work they are allowed to keep their job while Black Members are terminated.

g. White Members with less than 5 years of experience are allowed to move up to Journeymen or Welder whereas Black Men with 5, 10, and 15 years or more experience are not allowed the opportunity to move up.

h. White Members receive preferential and "down low" notification of job availability while Black Members receive no advance notice of job postings.

i. The Union tracks the race of its members on the Union "out-of-work card" and in its membership listings.

j. White Members laid off after Black Members are reemployed first.

k. White Members are allowed to work full time while Black Members are not allowed opportunities to work all year.

l. White Members are selected for higher wage jobs while Black Members are assigned to lower paying job sites.

m. White Members are called by their names or a nickname of their choosing while Black Members are referred to with pejorative terms like "Boy" or "Nigger" or "Nigga" or "Darkheads" and/or pejorative versions of their given names.

n. Black Members are made ridiculed because of their manner or speech while White Members are not.

o. Black Members are told if they work in certain areas of the country they will die, be killed or injured. White Members are not told these things.

p. Black Members are ridiculed for liking certain stereotyped foods while White Members are not.

q. Black Members have been subjected to having nooses displayed at their job sites as threats to kill them while no such death threats are made to White Members.

55. But for their race, Black Members would have been protected, advanced, and materially participated in the Union. Instead the Union has been allowed to continue discriminating with impunity against Black Members denying them opportunities for advancement and equal protection under the law.

56. The behavior condoned by and ignored by the Union Management was overtly race based and despite having direct knowledge of the same on multiple occasions, the Union took a blind eye to it and repeatedly placed Black Men in harms way and continue to do so today.

57. Unless this Court takes action to stop the discrimination, the Local 798 Pipeliners Union will continue to knowingly, intentionally, and openly discriminate against

Black Union Members until there are no more Black Union Members, which is what it wants to occur.

**B. Local 798 Imposes Discriminatory Requirements for Job Advancement and Treats Black Workers Seeking Job Advancement Disparately Compared to Non-Black Candidates**

58. In 2017, Defendant Local 798's Business Manager Danny Hendrix was interviewed by NPR. In response to a comment about how the Local Union's entire leadership team was all white men, Hendrix replied: "The cream always comes to the top[.]"

59. To this day, Defendant Local 798's leadership remains made up of exclusively White or White-passing men.[7]

60. Indeed, Defendant Local 798 has imposed job advancement requirements that it knows Black union members will not be able to meet because it intentionally ensures Black members will not meet or complete the requirements. Further, it does not hold White union members to those same standards prior to advancing them up the ranks.

61. Local 798's union members are generally classified into two positions – "Helper" or "Journeyman."

62. The position that is the most highly regarded and most highly compensated is that of Journeyman.

63. The position of Helper is a less highly regarded and is compensated at a lower rate than that of Journeyman.

[7] *See* Local 798 Elected Officers, available at https://local798.org/electedofficers/ (last accessed Jan. 4, 2023); Business Agents, available at https://local798.org/business-agents/ (last accessed Jan. 4, 2023).

64. Defendant Local 798's Handbook advises its members of two paths to move from the position of Helper to Journeyman.

65. The first path pertains to that of the Journeyman Welder. To become a Journeyman Welder a union member must, among other things, complete the following:

a. Accrue 5,000 hours of Covered Employment;
b. Complete 3 years of experience in Covered Employment;
c. Obtain 5 letters of recommendation from Welder or Journeyman Members of the union with whom they have worked directly;
d. Submit an application and be accepted into the Local 798 Training Center Downhill Welding School;
e. Complete the Local 798 Training Center Downhill Welding School, certification tests, and pay applicable fees.

66. The second path pertains to that of the Journeyman Spacer. To become a Journeyman Spacer a union member must, among other things, complete the following:

a. Submit a request to advance or change classification from Helper to Journeyman;
b. Obtain 5 letters of recommendation from Journeyman Welders or Journeyman Spacers who have witnessed the union member working as a Journeyman Spacer;
c. Complete 3,000 Helper hours in the last 10 years;
d. Complete 500 Journeyman hours in a "pipe gang" during the last 2 years that are recorded at Local 798's Office; and

e. Receive approval to change classifications from Local 798's Business Manager and Financial Secretary-Treasurer.

67. While these requirements may appear to be racially neutral, they are not.

68. Local 798's documented racist history cannot be forgotten when examining these requirements. In order to advance to the position of Journeyman Welder or Journeyman Spacer, Local 798 requires Black members to collect 5 letters of recommendation. Likewise, to advance to Journeyman Spacer, Black union members must be assigned 500 Journeyman hours. In other words, in order to have any hope of advancing, Black union members are dependent upon being given work hours and recommendations from Journeyman union members that a few short years ago actively rejected Black individuals and women from joining the union, let alone joining the journeyman ranks.

69. Defendant Local 798 uses these requirements as a subterfuge to ensure that Black members do not advance within the union.

70. It is not surprising that if there are any minority journeyman in Local 798, their numbers are nominal.

71. In addition to intentionally imposing advancement requirements that Black union members would find exceedingly difficult to meet, and further ensuring that Black members are actually prevented from meeting the requirements, Local 798 loosens these requirements for White union members, further helping ensure that the "cream" rises to the top.

72. White union members with less experience and seniority than Black union members, or even no seniority, can join Defendant Local 798 and promptly become Journeymen.

73. As a result of the foregoing, Black members are relegated to permanent second-class status in Defendant Local 798.

74. Because Black members are effectively barred from Journeyman positions, their lifetime earnings in this industry are drastically less than White male Journeymen.

## III. PLAINTIFF RODNEY JONES

75. Plaintiff Rodney Jones is a Black man.

76. In 2005, Mr. Jones joined Local 798 and remains a member to this day.

77. Mr. Jones is and has always been classified as a Helper, despite his reasonable efforts to advance.

### A. Local 798 Fails To Enforce Anti-Discrimination Policies on Jobsites Worked By Rodney Jones.

78. Like so many other Black members of Defendant Local 798, Mr. Jones has frequently been subjected to racist comments and actions while on the jobsite, yet after reporting these incidents or when the Union Steward otherwise knew of the events, nothing was done.

79. As a recent example, in 2017, Mr. Jones was working on a job in Detroit. While on the jobsite, a co-worker made racist comments to Mr. Jones about Black people being lazy and taking handouts. Mr. Jones voiced his disapproval of such comments and

reported this event to the Steward. The Steward said he would take care of it. The Steward did nothing.

80. In 2018 a noose was displayed at a jobsite on which Mr. Jones worked. Mr. Jones reported this to Union Representative Wade Pilgreen. As far as Mr. Jones is aware, no meaningful action was taken to investigate this event or hold anyone accountable.

81. Similarly, in 2019, Mr. Jones worked a job in Indiana. Mr. Jones was initially assigned to serve as Helper to Journeyman Welder Chris North. Chris North would taunt Mr. Jones with racial slurs. Likewise, this Journeyman Welder would tell Mr. Jones that the Union used to not allow Black individuals within its ranks. Mr. North told Mr. Jones that the while the Union now allows Black people into the union following the EEOC lawsuit, the Union makes it tough on them. Mr. North's statement is indicative of the Defendant Local 798's intent and efforts to make it difficult or impossible for Black union members to advance within the union.

82. Shortly thereafter, Chris North stated that he no longer wanted to work with Plaintiff Jones, and Plaintiff has reason to believe this was based upon his race.

83. While on the same jobsite, Welder Helper Anthony Gondike, used the word "nigga" while around Mr. Jones. Mr. Jones brought this to the Steward's attention, but the union chose not to do anything to enforce the CBA.

84. In fact, the words "dumb nigga" was used loosely and comfortably on the job site by white workers without any consequence, including any efforts by the union to enforce the CBA.

85. Likewise, Journeyman Spacer Cecil Shelton habitually made black and racist jokes in Plaintiff's presence to punish Plaintiff. The Steward was aware of this but did nothing to correct the behavior or otherwise enforce the CBA.

86. It is clear that Defendant Local 798's Stewards consistently refuse to enforce the CBA and fail to investigate, thwart, or take meaningful action against racist conduct that detrimentally affects their Black union members, including Mr. Jones.

87. Indeed, Mr. Jones is unaware of any Steward on any job he has worked taking action to enforce the CBA's non-discrimination provisions, including filing a grievance against, or otherwise imposing consequences on, a White employee for racist conduct.

### B. Local 798's Discriminatory Job Advancement Requirements Have Prohibited Rodney Jones and Other Black Union Members From Advancing to Journeyman.

88. Despite the hostile and racist environment Defendant Local 798 allows to persist on its jobsites, for many years Mr. Jones desired to remain in Local 798 and advance to the position of Journeyman.

89. For example, in March 2017, Mr. Jones desired to advance to the position of Journeyman Welder. By that time, Mr. Jones had completed 3 years and 5,000 hours of covered employment—thereby meeting two of the requirements to become a Journeyman Welder.

90. On March 26, 2017, Mr. Jones sent an email to the Union requesting an application to attend the Local 798 Training Center Downhill Welding School. Several days later, Mr. Jones received a response containing the application, form letters of recommendation, and a letter advising Mr. Jones that his application would not be

considered unless he obtained 5 letters of recommendation from a Welder or Welder Foreman.

91. The Union's instruction to Mr. Jones to get letters of recommendation from only Welders or Welder Foremen conflicts with the Union's handbook requirements that permit letters of recommendation from Welders or Journeyman (Spacer).

92. After receiving this email, Mr. Jones began requesting letters of recommendation from the Welders and Welder Foreman who previously worked with Mr. Jones. Some of these Welders and Welder Foreman had themselves engaged in racist behavior, or had allowed other union members to engage in racist behavior.

93. The form letters of recommendation require minimal work or original input. Aside from generally listing where the Welder or Journeyman witnessed the person working, the "recommendation" itself consists of two pre-drafted statements: "I would recommend this person as a good applicant" or "I have witnessed the above stated work but recommend more experience." The person completing the recommendation needs merely to mark which of these statements they agree with.

94. Mr. Jones sought letters of recommendation from upwards of 10 individuals. To his knowledge, none of them bothered to complete the form for him, despite his diligent follow up. On the other hand, Welders and Journeymen frequently complete letters of recommendation to assist in the advancement within the union of White Helpers.

95. Mr. Jones called Local 798's Welding School and was further discouraged from continuing to advance. Mr. Jones was informed that even if he completed his application, it could take years to get into the Welding School. He was further informed

how expensive the welding equipment was. On the other hand, the Welding School frequently assists and admits White union members who seek advancement within the union.

96. The roadblocks and discouragement Defendant Local 798 placed in Mr. Jones' path were effective and he ultimately gave up pursuing advancement to the Journeyman Welder position.

97. Mr. Jones is a hard-working, driven individual, however, and still desired to find a way to advance. Accordingly, in July 2017, Mr. Jones emailed Local 798's Financial Secretary-Treasurer Wade Pilgreen asking for guidance on how to advance.

98. In his response, Mr. Pilgreen attested to the fact that Mr. Jones was a dedicated worker with an impressive resume. Mr. Pilgreen suggested that Mr. Jones pursue advancement through the requirements necessary to become a Journeyman Spacer. Mr. Pilgreen suggested that Mr. Jones "do [his] best to get in a pipe gang and tell the pipe man and welder foreman that [he] would like to learn to space and carry the line[.]" Furthermore, Mr. Jones should "make sure each time [he does] that [to] tell the Steward to document those hours so you can change your classification to a Journeyman."

99. Consistent with Mr. Pilgreen's instructions, pursuant to Local 798's handbook Mr. Jones required at least 500 hours in a "pipe gang" during the preceding two years that are recorded at Local 798's office to meet this requirement to become a Journeyman Spacer.

100. With this guidance in mind, Mr. Jones sought out these required hours on the jobs he worked. Mr. Jones' requests for hours were routinely denied. Meanwhile, White Helpers seeking advancement were routinely assisted and given the required hours.

101. Instead, Mr. Jones and the few other Black workers he observed were regularly given less than desirable positions and duties such as janitorial duties, picking up metal shavings, and pre-heating welds.

102. Mr. Jones expressed his frustration to the Union. In July 2018, Mr. Jones emailed Local 798's business agent Charles Yates, Jr. stating:

> Hi Charles,
>
> I hope all is well. This email serves to explicitly express my concerns about the inability for upward advancement in Local 798. For more than a decade I have been a proud and outstanding union member who has consistently demonstrated an impeccable work ethic as well as a desire to move up in the union. My work experience with you personally (Sheehan Pipeline) where I have performed the duties of hydro-testing in addition to journeyman work was a positive one. I have taken initiative regarding education as I have consistently attended formal job trainings on my own. I have reached out to elected union officials in the past who have advised me to let my request(s) be made known to welder foremen. I have done so with no success. Therefore, I am asking for specific feedback in regards to what is it that I need to do propel forward. It has become increasingly frustrating to sit back and watch others with less knowledge and experience continue to receive opportunities that appear to be deprived of others. I look forward to your feedback. Please feel to contact me directly at 251-599-2130. Thank you in advance.
>
> Rodney Jones

103. Mr. Yates responded by phone but failed to provide Mr. Jones with any meaningful feedback or suggestions on how he could advance.

104. Despite these setbacks, Mr. Jones continued attempting to secure eligible hours to meet the requirements to become a Journeyman Spacer but has thus far been met with the same results.

105. Once again, the roadblocks Defendant Local 798 placed in Mr. Jones' path were effective in keeping Mr. Jones in the position of Helper.

106. Moreover, to Mr. Jones' frustration, the advancement requirements are disparately applied to White union workers. As expressed in Mr. Jones 2018 email to Local 798's Business Agent Charles Yates, Mr. Jones has witnessed White workers with less knowledge and experience advance to the role of Journeyman without having to meet the same requirements he has been held to.

107. Consistent with the statements of Journeyman Welder Chris North and Local 798's Business Manager Danny Hendrix, the Union has made it "tough" on minority union members, allowing only the white "cream" to rise to the top and advance. These efforts to hold back Black members, while assisting White members with their advancement, evidence the union's intent to discriminate against Mr. Jones and other Black employees based on race.

108. Jones made complaints to Stewards, Business Agents, Foremen, Supervisors and other Management within the Union and at the job site about the discriminatory conduct he was subjected to and observed.

109. The Union Stewards refused to investigate his complaints and refused to pursue grievances on his behalf.

110. Union Stewards would investigate claims made by White Members, they did not investigate or prosecute discrimination claims made by Black Members.

111. The Structure of the Union is such that it intentionally prevents a Member from being able to lodge complaints without the support of Stewards, Business Agents and other leadership because it must have their support to pursue those complaints. Black Members have little to no chance of every successfully prosecuting a grievance because leadership will not allow it to happen and leadership must prosecute the grievance.

112. When White Members make reports about CBA violations the Stewards will work to enforce the CBA on their behalf. Jones is not aware of any instance where the Union Stewards have acted to enforce the CBA on behalf of a Black Member at all but in particular in regard to racism.

113. Every time Jones complained about the conduct that he was subjected to he was at risk of losing his job, having someone use violence or force against him for challenging the discrimination, having his personal protective equipment altered or tampered with, and other such ramifications and leadership knew this and took no action to protect him and other black members or to stop the discrimination and harassment.

114. Jones specifically complained about Chris North and asked not to work with him because of the way he spoke about Black People.

115. North specifically told Jones that the only reason the Union allowed black people to join is because the Courts forced them to after being sued and said “We have to let you in now.”

116. North made statements about Black people acting entitled and like they were owed something.

117. White Member Cecil Shelton made jokes that black people were like monkeys.

118. In 2006 when Jones started with the Union Douglas Joe Womack and Jason Campbell were both helpers with the Union. Both have promoted up past Plaintiff. Womack is not a Journeyman and Campbell is a Welder.

119. Nearly all white employees who Jones worked with when he began his employment have been promoted past him while Jones cannot proceed further within the union.

120. When Jones was attempting to promote within the Union he contacted or attempted to contact every Foreman he ever worked with in the Union for a letter to support his promotion. No one would work with Jones to help him promote.

121. This failure to assist Jones was not about Jones as an individual or the quality of Plaintiff's work but was because Plaintiff was a Black male and the Union does not support the advancement of Black men in the Union beyond Welder's Helper.

122. Jones learned early on during his Union Membership that not all jobs were put on the job line. In 2010-2011 Plaintiff worked at the Marathon Plant in Detroit. Jones learned about a small job where he could work. Jones contacted the Foreman and asked about working on the job. The Foreman told Plaintiff in a very condescending manner that "You have to have a clean background for this job." Jones told the Foreman that this was not a problem.

123. Jones has a “TWIC Certification.” A Transportation Worker Identification Credential (TWIC) is a credential for all personnel requiring un-escorted access to secure areas of regulated facilities and vessels, and all mariners holding United States Coast Guard-issued credentials. Individuals who meet TWIC eligibility requirements will be issued a tamper- resistant credential containing the worker's biometric data (fingerprint template) to allow for a positive link between the card and the individual.

124. A TWIC Certification is a kind of Homeland Security Clearance that allows Jones to easily clear background investigations needed to work for higher clearance jobs.

125. The Bidding Agent Chris Lancaster was genuinely surprised that Jones had such a level of clearance and Plaintiff only got to work on this job because he had that clearance and the Agent could not find a qualified white Member to fill the position.

126. In 2017 Jones wanted to learn to be a pipe inspector. Jones approached a Steward about becoming a pipe inspector. The Steward told Jones that he could become an Inspector if he got the proper training.

127. Jones took time off of work to obtain the necessary training. The union did not pay for Plaintiff’s training and did not pay Plaintiff while he was at training.

128. When Jones returned from training, the same Steward who told him that he would be promoted to Inspector told him that he would not be eligible to be an Inspector.

129. When Jones asked to be paid for the time he was at training and reimbursed for the cost of the training the Steward told him no.

130. The Union paid for White members to go to the same training and paid white members to attend training.

131. The entire structure of the Union is intentionally set up in such a way that you must have the approval and support of higher union members to advance in the union.

132. The entire leadership of the Union is White.

133. None of the White leaders will allow a Black Member to advance. This is intentional and purposeful and unions have been set up in this structure since the beginning to control who advances through the ranks.

134. As a result of Local 798's Union Stewards failing to enforce the CBA and defend the rights of its Black members to work on a jobsite free of discrimination, Black union members frequently quit and move on to other professions.

**C. Mr. Jones Exhausted Administrative Remedies Necessary to Bringing Title VII Claims On Behalf of Himself and a Class**

135. Rodney Jones executed a charge with the Equal Employment Opportunity Commission (EEOC) on October 22, 2019 alleging Defendant Local 798 discriminated against him on the basis of his race in violation of Title VII.

136. The EEOC mailed a Notice of Right to Sue letter on August 17, 2020. *See* Exhibit 6 (Jones EEOC documents).

137. Suit was commenced on November 16, 2020 which is within the jurisdictional time frame for filing a Complaint to assert a claim under Title VII following the Notice of Right to Sue. Additionally, the 90th day fell on Sunday November 15, 2020 so the filing date is extended to November 16, 2020. *See* Fed.R.Civ.P. 6.

138. This amendment relates back to the date of the initial filing under Fed.R.Civ.P. 15(C)(1) because the claim asserted under Section 1981 was filed within the

93 day window of the right to sue letter's expiration. *See also Sessions v. Rusk State Hospital*, 648 F.2d 1066 (5th Cir. 1981); *Donnelly v. Yellow Freight System, Inc*., 874 F.2d 402 (7th Cir. 1989); and *Wilburn v. Dial Corp*., 724 F. Supp. 530, 535 (W.D. Tenn. 1989).

## IV. PLAINTIFF JOHN MCINTOSH

139. Long term Black Union Member, John McIntosh reported he had a repeated and ongoing history with the Union experienced intentional discrimination by his coworkers and the Union Stewards, Foreman and Supervisors and Managers at work sites. Some discriminatory experiences he reports included:

a. In June 2018 while working for Michels Corporation he saw a T-Shirt duct taped to a pipe. The shirt had the words "African Vibrations" in a font that looked like the letters were made of bones. There were exaggerated black stick figures depicting Africans wearing African jewelry with African drums. McIntosh was the only black man working on the site and was offended by the shirt. McIntosh reported the offensive conduct to Kenny the Pipeman. Kenny admitted that the shirt "could be" offensive. Kenny called Mike Hawkins, the Welder Foreman who ripped it off the pipe and said "there I took care of it." When McIntosh challenged the behavior Hawkins told him "You could have put it there."McIntosh denied putting the shirt there and demanded that Hawkins take action over the offensive incident. Hawkins did nothing.

b. As soon as McIntosh stated he was reporting the conduct Hawkins began attacking and threatening McIntosh over not wearing his PPE while reporting the offensive conduct. Hawkins then threatened to fire him. McIntosh reported

the conduct to Business Agent Charlie Yates. Yates took no action to protect McIntosh and took Hawkins side. Yates agreed that the shirt "could be offensive" but because no one admitted responsibility for it he refused to do anything further about the conduct. Yates then told McIntosh he either had to go back to work for Hawkins despite his threats and harassing conduct or he was fired.

c. McIntosh reported the offensive conduct to a women in the Michels Corporation Human Resources Department. The HR Department told McIntosh that he "shouldn't be offended by the shirt" and to go back to work.

d. No one with the Union or the Union Partner took any corrective action to protect McIntosh from the offensive environment instead they threatened and intimidated McIntosh for reporting and told him that he should not be offended.

e.

f. This incident is the same kind of thing that has happened over and over and is similar to the conduct reported by other individuals.

140. Other incidents experienced by John McIntosh during his employment include:

a. In October 2010 at a job site in Miles City, Montana, a White Member verbally attacked a Black member after the Black Member defended then President Barack Obama. This conduct was reported to Welder Foreman Bill Davis and the Black Member asked to be moved. Davis refused to move him and defended the White Member who harassed the Black Member claiming the Black Member

couldn't perform his job. Davis harassed the Black Member for the remaining period of time he worked on the job. The Black member filed a grievance against Bill Davis but the Union took no action against Davis.

b. On July 19, 2014, at a jobsite in Coldwater, Michigan, a White member intentionally threw a rock at McIntosh which hit him in the head. No assistance or medical treatment was offered. This was reported to Union Pipeman/Supervisor Pasquale who did not investigate the incident and took no action against the White Member. McIntosh requested that action be taken against the White Member and Pasquale refused to do so. Foreman Bill Ferguson and Pasquale told McIntosh the injury must have happened from him getting into a fight the previous night. A complaint was filed over this conduct and the Union did nothing. The McIntosh is now partially blind in that eye. On July 16, 2014, when a White member sustained an eye injury on a job site, Welder Foreman Bill Ferguson and Pasquale immediately took the White Member to the doctor.

c. In November 2014, at a job site in Montrose, Pennsylvania, a White member used the word "Nigger" while speaking with other White members. McIntosh reported the conduct and that he was offended to the Steward. The next day McIntosh was told to "Shut The Fuck Up and never talk about it again." The Black member was further told that if he didn't like it he could quit. Shortly thereafter, the Black members was approached by the White Welder Foreman, Jesse Davis, and White Steward, Dean Smith, and told to, "Leave because you

quit." McIntosh refused to leave and he was approached by the Assistant Spreadman, who told the Member that if he didn't leave the Assistant was going to call the State Police and have the Black member arrested for trespassing.

d. McIntosh spoke to Business Agent Rick Taylor, a White man, who told McIntosh member that there was nothing he could do about what happened. McIntosh requested Taylor and Hendrix to file a grievance and the Member was told "No. I'm not going to file a grievance for you."

e. In January 2017, at a job site in Cusetta, Alabama, McIntosh was almost purposely struck with a car driven by a White co-worker. The White member yelled profanity at McIntosh and intentionally drove over the McIntosh member's propane bottle. The White member said "Fuck you and that propane bottle." Welder Foreman Bill Clendid removed McIntosh member from the job site and did nothing to the White member. McIntosh reported all of this to Local 798's Steward, who said both the McIntosh and the White member would be written up. McIntosh was then fired the next day while the White member who committed a crime by trying to hit the McIntosh with a car was only written up.

f. Following the 2008 presidential election, Black members were routinely called racial slurs and affronted with racist jokes on the jobsite, while White workers openly discussed the need to assassinate then-President Obama. This was done in the presence of Stewards, Foremen, and other Union Leadership and the Union did nothing to stop the conduct, which clearly violated the CBA's anti-discrimination policy and the law. White members were allowed to be offensive,

threatening, derogatory and incite violence to Black people in general, and Union Leadership imposed no discipline, failing to protect Black Union members.

g. In 2007, McIntosh on a Union job site for Michels Corporation reported discrimination to his Union Stewards. McIntosh was subsequently retaliated against when he was fired for the pretextual reason of failing to wear safety glasses. McIntosh denied this and reported the termination to the Union Steward. The Union Steward refused to take any action with Michels, refused to file a grievance, and instead moved McIntosh to another location.

141. While working with the Local 798 McIntosh experienced some of the following acts of discrimination:

a. Being referred to as “Boy” in lieu of using his name. It is a common that Black men are referred to as “Boy” routinely. No such pejorative name is used for White men in lieu of their name.

b. Being called a “Nigger” or hearing White co-workers and supervisors refer generically to all Black men and women as “Nigger” or “Niggers.”

c. The word “Nigger” was scrawled in graffiti all over job sites and portable restrooms.

d. Finding a noose on a job site.

e. Jokes about Black people ‘foods’ and referencing fried chicken, moonpies, water melon, chitterlings and such.

f. Widespread distribution of monkey pictures on job sites and being referred to as monkeys, gorillas or apes.

g. References to Black male penis size and "big black cock" jokes.

h. Widespread distribution of pictures of children from Africa and making jokes about Black families and children.

i. Threats about Black people disappearing in certain locations or being hurt. While working for the Local 798 a Black man died under suspicious circumstances after hours. The Union claimed it was a suicide but the individual had just started working for the Union and had experienced discrimination like that described herein.

j. When laid off, white Helpers laid off after him were hired before he and other Black Helpers were even though rehire is supposed to correlate with length of time off work.

k. White Helpers were given preferential notification of jobs to bid on job opportunities.

l. White Helpers would be awarded jobs even when the better bid was submitted by a Black Helper.

m. White Helpers were allowed to work fulltime hours while he and other Black Helpers were not allowed to get to full time hours each year.

n. White Helpers with less experience were selected to go to the locations that had higher scale pay.

o. White Helpers who had less than 5 years of experience were allowed to obtain Isolated Journeymen books for jobs that Ball and other Black Helpers with more than 5 years of experience were denied.

p. When Ball went as to work in building trades at a site White Welders with Local 798 made it known that he as a Black man was not supposed to be working in that position.

q. White workers were paid overtime, often under the table and Black workers were denied overtime.

142. But for McIntosh being Black he would not have experienced this hostile and discriminatory conduct because White Members are not treated this way.

## V. PLAINTIFF MARCUS BALL

143. Marcus Ball is a Black man residing in Sallis Mississippi. Ball has been a member of the Local 798 since 2004.

144. Ball left the Local 798 in 2022 due to the ongoing discrimination and lack of advancement with the Union.

145. During his membership with Local 798 he would work with other Local Unions that were not 798 and he was allowed to work as a Journeyman in Building Trades but not on Pipeline work with Local 798.

146. Ball was employed as a Helper his entire membership with Local 798.

147. Ball made multiple attempts over the years of his membership to move up to Journeyman with the Local 798 but every time he inquired about an opportunity to advance to Journeyman or Welder he was given an excuse why he could not advance.

148. During his time with Local 798, Taylor never had the opportunity to work a full 2080 hours per year.

149. Ball learned quickly in his time as a member that the Officers, Business Agents, Stewards, Organizers, Dispatchers, and Welders would not protect him or help him advance.

150. Ball was often the only Black Helper on a job site.

151. Ball quickly learned that the color of his skin was a direct barrier to his advancement in the Union.

152. Ball also quickly learned that if he complained about his mistreatment that he would not only lose his job but that much worse would likely happen to him.

153. Ball saw what happened to individuals who reported racist conduct. They were terminated, threatened, ridiculed, and retaliated against.

154. Out of fear for his safety and his ability to provide for his family Ball did not report the things that happened to him or the things he saw happen to others..

155. It was common knowledge that if you report and attempt to pursue a grievance that Management would actively avoid pursuing the claims and that you would be retaliated against and would be the first laid off.

156. While working with the Local 798 Ball experienced some of the following acts of discrimination:

a. Being referred to as “Boy” in lieu of using his name. It is a common that Black men are referred to as “Boy” routinely. No such pejorative name is used for White men in lieu of their name.

b. Being called a "Nigger" or hearing White co-workers and supervisors refer generically to all Black men and women as "Nigger" or "Niggers."

c. The word "Nigger" was scrawled in graffiti all over job sites and portable restrooms.

d. Finding a noose on a job site.

e. Jokes about Black people 'foods' and referencing fried chicken, moonpies, water melon, chitterlings and such.

f. Widespread distribution of monkey pictures on job sites and being referred to as monkeys, gorillas or apes.

g. References to Black male penis size and "big black cock" jokes.

h. Widespread distribution of pictures of children from Africa and making jokes about Black families and children.

i. Threats about Black people disappearing in certain locations or being hurt. While working for the Local 798 a Black man died under suspicious circumstances after hours. The Union claimed it was a suicide but the individual had just started working for the Union and had experienced discrimination like that described herein.

j. When laid off, white Helpers laid off after him were hired before he and other Black Helpers were even though rehire is supposed to correlate with length of time off work.

k. White Helpers were given preferential notification of jobs to bid on job opportunities.

l. White Helpers would be awarded jobs even when the better bid was submitted by a Black Helper.

m. White Helpers were allowed to work fulltime hours while he and other Black Helpers were not allowed to get to full time hours each year.

n. White Helpers with less experience were selected to go to the locations that had higher scale pay.

o. White Helpers who had less than 5 years of experience were allowed to obtain Isolated Journeymen books for jobs that Ball and other Black Helpers with more than 5 years of experience were denied.

p. When Ball went as to work in building trades at a site White Welders with Local 798 made it known that he as a Black man was not supposed to be working in that position.

q. White workers were paid overtime, often under the table and Black workers were denied overtime.

157. Ball left Local 798 because it was made clear to him that he would never be allowed to advance past a Helper at Local 798 because he was Black.

158. Out of fear for his safety and his ability to provide for his family Ball did not report the things that happened to him or the things he saw happen to others.

159. It was common knowledge that if you report and attempt to pursue a grievance that Management would actively avoid pursuing the claims and that you would be retaliated against.

160. The last job that Ball worked was in July 2022.

161. Ball experienced this treatment because he was a Black male. White Males did not experience this kind of treatment and discrimination.

162. But for Ball being Black he would not have experienced this hostile and discriminatory conduct because White Members are not treated this way.

## VI. PLAINTIFF KELLY JORDAN

163. Kelly Jordan is a Black male residing in Irontown, Pennsylvania. Jordan has been a member of the Local 798 since 2007.

164. Jordan is an active Member of Local 798 and has still not been promoted or been given the opportunity to promote in 16 years of Union Membership.

165. Jordan has sought out Journeymen training and has been denied the opportunity to receive it.

166. Jordan was told other individuals already welding could go to Journeymen training but he could not as a Member of Local 798.

167. In his first year of membership with the Union, Jordan was threatened with a gun by a White Welder. The Welder was dismissed from the specific job site but he was not dismissed from the Union.

168. The Welder, Nathan Bowes, who threatened Jordan had been making nooses and throwing them at Jordan's head all day while he was trying to do his work. When

Jordan confronted the assailant, the assailant hit Jordan and then contacted the Foreman claiming Jordan was the instigator. The Foreman took no action against Nathan Bowes but decided to remove Jordan from the job site. As Jordan was being removed from the job site by the Foreman, Bowes retrieved a shotgun from his car and threatened to Jordan. The Foremen and other White workers on site did not call the Police or make a report. Instead, they talked Bowes into leaving the site. Afterwards the Steward told Jordan he could take it to court if he wanted to but Bowes was gone so he should be happy with that. Local 798 never did anything about Bowes or the conduct on the site.

169. In another instance Jordan and his sister both worked a Local 798 job. Supervisor Ed Brumley would have a safety meeting every day. However, instead of it being a true safety meeting, Brumley would stand on told of the electric coils while it was dark outside and say racist things. One day he said ‘We aren’t gonna let these fucking people, darkheads take our fucking jobs.’ Jordan’s sister was so scared that she left the Union. Later that day Jordan was assaulted by another White worker. Jordan contacted the Business Agent who said “Kelly you can file charge *if you want*” making it clear through his tone of voice and mannerisms that nothing would happen and he was at risk if he did.

170. Jordan was afraid for his life and his job so he did not report the incident.

171. While working with the Local 798 Jordan routinely experienced these kinds of acts of discrimination:

a. Being referred to as “Boy” in lieu of using his name. It is a common that Black men are referred to as “Boy” routinely. No such pejorative name is used for White men in lieu of their name.

b. Being called a “Nigger” or hearing White co-workers and supervisors refer generically to all Black men and women as “Nigger” or “Niggers.”

c. The word “Nigger” was scrawled in graffiti all over job sites and portable restrooms.

d. Finding a noose on a job site.

e. Jokes about Black people ‘foods’ and referencing fried chicken, moonpies, water melon, chitterlings and such.

f. Widespread distribution of monkey pictures on job sites and being referred to as monkeys, gorillas or apes.

g. References to Black male penis size and “big black cock” jokes.

h. Widespread distribution of pictures of children from Africa and making jokes about Black families and children.

i. Threats about Black people disappearing in certain locations or being hurt.

j. When laid off, white Helpers laid off after him were hired before he and other Black Helpers were even though rehire is supposed to correlate with length of time off work.

k. White Helpers were given preferential notification of jobs to bid on job opportunities.

l. White Helpers would be awarded jobs even when the better bid was submitted by a Black Helper.

m. White Helpers were allowed to work fulltime hours while he and other Black Helpers were not allowed to get to full time hours each year.

n. White Helpers with less experience were selected to go to the locations that had higher scale pay.

o. White Helpers who had less experience were allowed to move up and train as Journeymen and Welders when Black men were not.

172. Jordan quickly learned that the color of his skin was a direct barrier to his advancement in the Union.

173. Jordan also quickly learned that if he complained about his mistreatment that he would not only lose his job but that much worse would likely happen to him.

174. Jordan saw what happened to individuals who reported racist conduct. They were terminated, threatened, ridiculed, and retaliated against.

175. Out of fear for his safety and his ability to provide for his family Jordan did not report the things that happened to him or the things he saw happen to others.

176. It was common knowledge that if you report and attempt to pursue a grievance that Management would actively avoid pursuing the claims and that you would be retaliated against.

177. The times that Jordan tried to report the discrimination he was directly and indirectly told nothing would happen and that he was at risk if he pursued it.

178. Jordan experienced this treatment because he was a Black male. White Males did not experience this kind of treatment and discrimination.

179. But for Jordan being Black he would not have experienced this hostile and discriminatory conduct because White Members are not treated this way.

## VII. PLAINTIFF ANTHONY TAYLOR

180. Anthony Taylor is a Black man residing in Nashville Tennessee. Taylor has been a member of the Local 798 since 2007.

181. In November 2022, Taylor transferred his members hip to the Plumbers and Pipefitters Local 198 out of Baton Rouge Louisiana due to discrimination that the suffered on the job.

182. Tayor was employed as a Helper his entire membership with Local 798.

183. Taylor made multiple attempts over the years of his membership to move up to Journeyman with the Local 798 but every time he inquired about an opportunity to advance to Journeyman or Welder he was given an excuse why he could not advance.

184. During his time with Local 798, Taylor never had the opportunity to work a full 2080 hours per year.

185. Taylor learned quickly in his time as a member that the Officers, Business Agents, Stewards, Organizers, Dispatchers, and Welders would not protect him or help him advance.

186. Taylor was often the only Black Helper on a job site.

187. The environment for a Black Member was one where the co-workers made him feel like he was not supposed to be there, the tension in the air was thick and he was always on guard about making a mistake for fear of losing his job.

188. During his employment Taylor experienced the following kinds of discriminatory behavior;

a. A noose being left on a job site.

b. Racist and derogatory jokes about Black men and women.

c. Comments about the way Black people speak and Black slang.

d. Comments and jokes about 'Black People food' like fried chicken, watermelon, chitterlings, and moon pies.

e. Racist jokes about Black people versus White people.

f. Black Men and Women being compared to monkeys, gorillas, or apes.

g. Derogatory comments about Black penis size, stealing white women, and about 'Big Black Cock.'

h. The word "Nigger" was often written on port-a-potties and on pipe he had to work on, and other derogatory experiences described by the other potential class members.

189. Early in his career with the Union Taylor and a White Helper were both late to the job site. The White Helper kept his job and Taylor was terminated.

190. White Helpers were given preferential job assignments and access to job postings that Black Helpers were not given.

191. Taylor quickly learned that the color of his skin was a direct barrier to his advancement in the Union.

192. Taylor also quickly learned that if he complained about his mistreatment that he would not only lose his job but that much worse would likely happen to him.

193. Taylor saw what happened to individuals who reported racist conduct. They were terminated, threatened, ridiculed, and retaliated against.

194. Out of fear for his safety and his ability to provide for his family Taylor did not report the things that happened to him or the things he saw happen to others.

195. It was common knowledge that if you report and attempt to pursue a grievance that Management would actively avoid pursuing the claims and that you would be retaliated against.

196. The last job that Taylor worked was in 2021.

197. Taylor left the Local 798 in November 2022 because he knew that he would never advance in the Union.

198. For a year prior to leaving the Union, Taylor was unemployed for a year while White Helpers with the same or less experience were hired over him for jobs that he was qualified to hold.

199. Taylor is now an active member of the Local 198 out of Baton Rouge. Taylor does not experience discrimination as a Member of the Local 198.

200. Taylor has worked the same job as a Member of Local 198 since November of 2022 and is on his way to advancing in the Local 198 in ways he was never able to accomplish in the Local 798.

201. But for Taylor being Black he would not have experienced this hostile and discriminatory conduct because White Helpers are not treated this way.

## VIII. EXPERIENCES OF UNNAMED CLASS MEMBERS

202. On information and belief, a Black Helper recently filed a grievance alleging that a White Member repeatedly threated to assault and kill him on the job due to his race.

203. On information and belief the White Member also threatened the Black Helpers job, used pejorative race based names, and made other racial slurs while on the job site.

204. On information and belief upon reporting the conduct the Black Helper was terminated and the White Welder kept his job.

205. Unnamed Class Member 2 ("UCM 2"), who has been a member of the Union since 2017 reported the following information including incidents of harassment, discrimination, and failure of the Union to take action to protect him and others:

a. Throughout his career with the Union, UCM 2has been treated harshly, unfairly and differently than White members, by White members of the union from the highest management to the lowest level of worker.

b. The discrimination was so severe UCM 2questioned whether continuing to work for the Union was safe for his mental health due to the harassment and discrimination he was subjected to at work every day.

c. Advancement in the union occurs through relationships built while working on the job. However, Black members were intentionally prohibited from developing those relationships needed to advance.

d. Black members would be put on the same stage of a job to work or in the same kind of job to work and not allowed the opportunity to come into contact with supervisors, foreman, welders, or journeymen on other jobs to allow them opportunity for advancement.

e. Additionally, Union Members may obtain contract jobs with Pipeline Companies through interacting with the Pipeline employees on the job.

f. Specifically, on one job, the Foreman put all Black members on work with preheating pipe. Working on preheating pipe jobs allows little to no opportunity for the Union members to have contact with the Pipeline Employees needed to obtain contract jobs.

g. Black Helpers working on the preheating jobs specifically requested opportunities to work with welders to have the opportunity to advance and build relationships with the pipeline companies.

h. Black Helpers were denied the opportunity or chance to work with the Welders.

i. White Helpers with the same or less experience than Black Helpers were given the opportunity to work with the welders whether they asked for the opportunity or not.

j. White Helpers, Welders, Foremen, Supervisors, Journeymen, and others routinely used racial slurs and derogatory language when speaking to or about Black people.

k. The member stated that he knew if he reported or said anything about these racial slurs, he would be retaliated against by losing his job or future opportunities to work. However, the Union Stewards are aware that all of this goes on.

l. On one job site, a mechanic was working on something and she was not happy with how it was going. The mechanic said, “well I got to fucking Nigger rig it.” The reporting member was present when she said this. The other White workers began to laugh and the Black member was visibly uncomfortable.

m. The reporting member was afraid to speak about what was happening due to fear of retaliation, including termination. He also believed complaining or pursuing a grievance would be futile since the Union Stewards were already aware of what was going on.

n. On another job a White man dropped a crescent wrench while working in a high location. The worker said “I gotta chase that Nigger all the way to the bottom.”

o. The reporting member routinely experienced job assignments where White Helpers were paid full scale pay, while Black members on the same job, with the same experience, and with longer membership time than the White members, were paid less.

p. On another job, UCM 2 was helping a Black welder on the site, as they were moving down an assembly firing line (which means each welder makes a weld pass and then moves to the next joint). They noticed that there were orange peels laying on the floor where the welder would have to lay to do the weld. As they moved down the line to each joint thereafter, we found more orange peels laying

on the ground where the welder had to lay to weld. The White welders and their Helpers were visibly laughing and pointing at making the Black welders lay in trash.

q. The kind of conduct described here was regular on the job, was done in front of Foreman, Supervisors, Stewards and all levels of management, and no one ever took any action to stop it.

r. The Foreman, Supervisors, Stewards, Welders, and Journeyman all knew that the White members discriminated against and harassed the Black employees and did nothing to stop it and in fact encouraged the behavior.

206. Unnamed Class Member 3 ("UCM 3"), who has been a Union member since 2006 reported the following information including incidents of harassment, discrimination, and failure of the Union Management, Stewards, Foreman, Supervisors, Welders, and Journeymen to take action to protect him and others from discrimination:

a. In 2015 while in Missouri working on a job, UCM 3 was pulled off a line to allegedly train for another position, and told that I was too short to do the work. Three White women who were shorter than I am were allowed to do the work.

b. UCM 3 was not given any work and told there was no work for me to do and was released from the job.

c. A Black woman was also released from the job.

d. The Union Foreman objected to me receiving unemployment benefits after being let go from the job.

e. UCM 3observed Black women being assigned to physically demanding jobs that White women were never assigned to.

f. On one occasion, UCM 3 was assigned to buff pipe, working alongside a Black woman. We were humiliated for not buffing the pipe fast enough and removed.

g. Black men and women were constantly made fun off and made the butt of jokes in the presence of and by management and nothing was ever done to stop the discrimination.

h. We were afraid to report the discrimination or lodge complaints, for fear of retaliation.

i. Young Black men were treated the worst and given the most physically demanding jobs and not paid the same as similarly qualified and tenured White workers. White workers did not do work that was equally strenuous or physically demanding.

207. On information and belief, all unnamed class members experienced the following kinds of discriminatory behavior;

a. Racist and derogatory jokes about Black men and women.

b. Comments about the way Black people speak and Black slang.

c. Comments and jokes about ‘Black People food’ like fried chicken, watermelon, chitterlings, and moon pies.

d. Racist jokes about Black people versus White people.

e. Black Men and Women being compared to monkeys, gorillas, or apes.

f. Derogatory comments about Black penis size, stealing white women, and about "Big Black Cock."

g. The word "Nigger" was often written on port-a-potties and on pipe class members had to work on.

## CLASS ACTION ALLEGATIONS

208. Defendant Local 798 engages in a pattern and practice of intentional discrimination against Black members in violation of Section 1981 and Title VII by:

h. Denying Black members promotion from Helper to either Welder or Journeyman Spacer, on the same terms as others, including by making it nearly impossible for Black members to meet stated promotional requirements, while simultaneously assisting White members through the process or waiving the requirements for them all together;8

i. Denying Black members equal terms and conditions of employment, including but not limited to, in relation to training, compensation, overtime, job assignment, termination, and layoff;

j. Refusing to enforce the collective bargaining agreement as to Black members;

k. Retaliating against Black members who complain or engage in other protected activity; and

---

[8] Alternatively, Local 798 has violated Title VII by implementing a facially neutral promotion policy, that adversely impacts Black members. While this claim, arguable, was not exhausted at the EEOC, Plaintiffs reserve their right to amend their pleading to assert a disparate impact claim, once administrative exhaustion is completed.

l. Subjecting them to a hostile working environment.

209. Defendant Local 798's violations of Section 1981 and Title VII are intentional and willful.

210. Plaintiffs brings this action on behalf of themselves, and as representatives of a proposed class, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Proposed Classis defined as:

> All Black members of Defendant Local 798 who worked under the CBA at any time during the relevant time period.

211. Excluded from the class are Defendant Local 798 and any of its respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiffs reserves the right to modify or amend the class definition, as appropriate, during the course of this litigation

212. *Numerosity*: The members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. The precise number of class members are unknown to Plaintiffs, but can be obtained from Defendant Local 798's records and, based upon information and belief, is presumed to be not less than 500 members. The names and addresses of the class members are identifiable through documents maintained by Defendant Local 798, and the class members may be notified of the pendency of this action by published and/or mailed notice.

213. *Typicality*: Plaintiffs' claims are typical of those of the other class members. Defendant Local 798 chose not to enforce the collective bargaining agreement on jobsites

where both Plaintiffs and the class members worked, because of the race of Plaintiffs and the class members. Furthermore, Defendant intentionally discriminated against Plaintiff and the other class members by imposing advancement requirements that it knew Plaintiff and the other class members could not meet, or which it prevented them from meeting, and disparately applied these requirements to White union members that were looking to advance. This directly stifled the ability of Plaintiff and the other class members to advance to the role of Journeyman within the Union. Defendant further denied Plaintiffs and the class members enjoyment of equal terms and conditions of employment, including but not limited to, in relation to training, compensation, overtime, job assignment, termination, and layoff. It also subjected Plaintiffs and the class members to a hostile working environment.

214. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly given that individual plaintiffs lack the financial resources to vigorously prosecute separate lawsuits in court against a substantial and well-funded defendant, such as Defendant Local 798.

215. *Adequacy of representation*: The Plaintiffs, acting as class representatives, will fairly and adequately protect the interest of the classes.

216. Plaintiffs have retained counsel experienced in complex class litigation.

217. Neither Plaintiffs, nor the undersigned counsel, have any interest antagonistic to or in conflict with the members of the classes they seek to represent. The Plaintiffs are aware of their responsibilities to the putative class and have accepted such responsibilities.

218. *Commonality*: Common questions of law and fact exist as to all members of the class and predominate over any question solely affecting individual members of the class, including but not limited to:

a. Whether Defendant imposed advancement requirements with the intent of stopping and/or discouraging Plaintiff and the class members from advancing to the position of Welder and Journeyman Spacer;

b. Whether Defendant disparately applies the advancement requirements to the benefit of White Union members;

c. Whether Defendant fails to enforce the CBA because of the race of the Class members affected by violations of the CBA's non-discrimination provisions;

d. Whether Defendant denies Plaintiffs and the Class members the enjoyment of equal terms and conditions of employment because of their race;

e. Whether Defendants subjected Plaintiff and the Class members to a hostile work environment because of their race;

f. Whether Defendant's actions were intentional or willful;

g. Whether Defendant's actions violate Section 1981 and/or Title VII;

h. Whether Plaintiff and the class members are entitled to declaratory, equitable, or injunctive relief, damages and/or other relief; and

i. The amount and nature of damages to be awarded to Plaintiff and the other class members.

219. This case is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(1) because prosecution of actions by individual members of the class would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for Defendant Local 798.

220. This case is maintainable under Federal Rule of Civil Procedure 23(b)(2) because Defendant Local 798 has acted or refused to act on grounds generally applicable to Plaintiff and the other class members, thereby making appropriate final injunctive relief and declaratory relief, with respect to the class members as a whole.

221. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to each class predominate over any questions affecting only individual members of each class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant Local 798's common and uniform policies and practices denied each class member the benefits of the collective bargaining agreement under which they worked and the opportunity for advancement beyond the Helper position in Defendant Local 798. The damages suffered by the individual members of each class are small compared to the expense and burden of individual prosecution of this litigation. In addition, class certification is superior because it will obviate need for unduly duplicative litigation that might result in inconsistent judgments about Defendant Local 798's practices.

222. To the extent a class does not meet the requirements of Rule 23(b)(1)-(3), Plaintiff seeks the certification of issues that will drive the litigation toward resolution under Federal Rule of Civil Procedure 23(c)(4).

223. Plaintiffs intend to send notice to all members of each class to the extent required by Rule 23. The names and addresses of each class member are available from Defendant Local 798.

## CLAIMS

**COUNT I: Race Discrimination Under 42 U.S.C. § 1981(Failure to Enforce the Terms of the Collective Bargaining Agreement)**

224. Plaintiffs restate and incorporate the paragraphs above, as if fully alleged herein.

225. Plaintiffs brings this claim individually and on behalf of the other members of the Class.

226. Plaintiffs are each Black men.

227. While working on job sites governed by Local 798's collective bargaining agreements, Plaintiffs, and the other Class members been subjected to severe, pervasive, and objectively racist conduct.

228. Local 798's Union Stewards on these job sites knew or should have known of the racist conduct affecting Plaintiffs and the other Class members.

229. When Plaintiffs and the other Class members attempted to file grievances or otherwise complain, they were discouraged and retaliated against.

230. It was well-known within the Union that the Union Stewards would not pursue grievances on behalf of Black members.

231. Plaintiff's race, and the race of the other Class members, is the reason Local 798's Union Stewards' fail to enforce the terms of the collective bargaining agreement that

would otherwise protect Plaintiff from working in a racially hostile work environment and from experiencing other forms of race discrimination.

232. As a direct and proximate result of Defendant Local 798's unlawful, discriminatory conduct, Plaintiffs and the other Class members have suffered through untenable racist conduct on job-sites governed by the collective bargaining agreement and denied the benefits of that Agreement.

233. As a direct and proximate result of Defendant Local 798's unlawful, discriminatory conduct, Plaintiffs and the other Class membershave suffered economic and non-economic injuries including pain, suffering, and emotional distress.

234. As a direct and proximate result of Defendant Local 798's unlawful, discriminatory conduct, Plaintiffs and the other Class members are entitled to all available damages pursuant to 42 USC § 1981(a).

235. Defendant Local 798's actions were willful, wanton, malicious, and in gross disregard of Plaintiff's, and the other Class members' rights entitling them to punitive damages.

**COUNT II: Race Discrimination Under 42 U.S.C. § 1981 (Failure to Promote)**

236. Plaintiff restates and incorporates all previous paragraphs, above, as if fully alleged herein.

237. Plaintiff brings this claim individually and on behalf of the other Class members.

238. Local 798 has instituted requirements necessary for union members to advance from the role of Helper to Journeyman Welder and Journeyman Spacer.

239. With full knowledge of its racist history and racist members, Local 798 included advancement requirements that it knew would be generally unobtainable for Black union members, or that it could use as a pretext to prevent the promotion of Black union members. Such requirements included the need to obtain at least five letters of recommendation from supervisory union members and (to become a Journeyman Spacer) the need to obtain a set amount of hours that could only be assigned by supervisory workers.

240. Plaintiffs and the other Class members are Black Union members.

241. Plaintiffs and the other Class members were qualified for promotion to Welder or Journeyman Spacer.

242. Some of the Plaintiffs and the other Class members actively sought promotion. Others knew that seeking promotion was futile, because they would not be promoted because of their race.

243. Despite the fact that Plaintiffand the other Class members were not promoted, Plaintiffs observed White union members with less experience and seniority obtain the requisite recommendations and hours needed to advance with little difficulty.

244. Furthermore, Plaintiffs observed White union members with less experience and seniority move to Journeyman status without being required to meet the advancement requirements he was being held to.

245. Accordingly, Local 798 treated Plaintiffs and the other Class members less favorably than similarly-situated White members of Defendant Local 798 because of their race.

246. Defendant Local 798 acted intentionally when it set and implemented its promotion requirements to deny Plaintiffs and the other Class members promotion because of race.

247. Defendant Local 798's discriminatory purpose is evidenced by its long and recent history of discrimination, and its present promotional practices, used to exclude Plaintiff and the other class members from the role of Welder and Journeyman Pipe Spacer, are tied to this history of discrimination and can be traced to a discriminatory purpose.

248. As a direct and proximate result of Defendant Local 798's unlawful, discriminatory conduct, Plaintiffs and the other Class members have been denied advancement.

249. As a direct and proximate result of Defendant Local 798's unlawful, discriminatory conduct, Plaintiffs and the other Class members have suffered economic injuries in the form of lost/diminished wages.

250. As a direct and proximate result of Defendant Local 798's unlawful, discriminatory conduct, Plaintiffs and the other Clsas members have suffered non-economic injuries in the form of emotional pain and suffering.

251. As a direct and proximate result of Defendant Local 798's unlawful, discriminatory conduct, Plaintiffs and the other Class members are entitled to all available damages pursuant to 42 USC § 1981(a).

252. Plaintiffs and the other Class members also seek declaratory or injunction relief entitled them to promotion.

253. Defendant Local 798's actions were willful, wanton, malicious, and in gross disregard of Plaintiff's, and other members similarly situated to him, rights entitling Plaintiff and the putative class members to punitive damages.

**COUNT III: Race Discrimination Under 42 U.S.C. § 2000e (Failure to Enforce the Terms of the Collective Bargaining Agreement)**

254. Plaintiffs restate and incorporate all previous paragraphs, above, as if fully alleged herein.

255. Plaintiff brings this claim individually and on behalf of the other Class members.

256. Plaintiffs are Black.

257. While working on job sites governed by Local 798's collective bargaining agreements, Plaintiffs and the other Class members ahave been subjected to severe, pervasive, and objectively racist conduct.

258. Local 798's Union Stewards on these job sites knew or should have known of the racist conduct affecting Plaintiffs and the other Class members.

259. Nonetheless, Local 798's Union Stewards consistently failed to enforce the terms of the collective bargaining agreements to stem this racist conduct.

260. Local 798's failure to enforce the anti-discrimination clause of the Collective Bargaining Agreement impacted Plaintiffs and the other Class members based on race.

261. As a direct and proximate result of Defendant Local 798's conduct and failure to enforce, Plaintiffs and the other Class members have suffered through untenable

racist conduct on job-sites governed by the collective bargaining agreement and denied the benefits of that Agreement.

262. As a direct and proximate result of Defendant Local 798's conduct and failure to enforce, Plaintiffs and the other Class members have suffered economic and non-economic injuries including pain, suffering, and emotional distress.

263. As a direct and proximate result of Defendant Local 798's conduct and failure to enforce, Plaintiff, and other members similarly situated to him, is entitled to all available damages pursuant to 42 USC § 2000e.

264. Plaintiff and the other class members also seek relief in the form of a declaration or injunction requiring Defendant Local 798 to enforce the terms of the CBA going forward.

265. Defendant Local 798's actions were willful, wanton, malicious, and in gross disregard of Plaintiff's, and other members similarly situated to him, rights entitling Plaintiff and the putative class members to punitive damages.

**COUNT IV: Race Discrimination Under 42 U.S.C. § 1981 (Unequal Terms and Conditions of Employment)**

266. Plaintiffs restate and incorporate all previous paragraphs, above, as if fully alleged herein.

267. Plaintiffs brings this claim individually and on behalf of the other Class members.

268. Plaintiffs are Black.

269. Plaintiffs and the other Class members were treated less favorably than similarly situated White coworkers in regards to the terms and conditions of employment, including, compensation, overtime, job assignments, termination, and layoff.

270. The Union intentionally trated Plaintiffs and the other Class members less favorably because of their race. This is evidenced by the racist history of the union, the present racism that permeates the Union, the Union's failure to enforce the CBA to protect Black members, and other factors described herein.

271. Plaintiffs and the other Class members have suffered economic and emotional damages as a result of Defendant's willful, wanton, and intentional conduct.

**COUNT V: Race Discrimination Under 42 U.S.C. § 1981 (Hostile Work Environment)**

272. Plaintiffs restate and incorporate all previous paragraphs, above, as if fully alleged herein.

273. Plaintiffs brings this claim individually and on behalf of the other Class members.

274. Plaintiffs are Black.

275. Plaintiffs and the other Class members were subjected to severe and pervasive hostile work environment harassment on the basis of their race, at every Local 798 job site..

276. The Union intentionally ignored complaints of harassment and allowed the harassment to continue.

Plaintiffs and the other Class members have suffered economic and emotional damages as a result of Defendant's willful, wanton, and intentional conduct.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and all other individuals similarly-situated request that this Court find for him and each class identified above, and award the following:

a) An order certifying this action as a class action under Rule 23;

b) Designation of Plaintiff as Class Representative;

c) Designation of undersigned counsel as Class Counsel;

d) Declaring that Defendant is financially responsible for notifying the class members of the pendency of this suit.

e) Declaring Defendant's actions as violations of Section 1981;

f) Declaring Defendant's actions as violations of Title VII

g) Awarding injunctive relief as permitted by law or equity, including requiring Defendant to enforce the terms of the CBA on a go-forward basis, and requiring Defendant to promote Plaintiff and other qualified class members to Journeyman.

e) An order declaring Defendant's actions as willful;

f) All monetary and statutory relief available under 42 USC § 1981 as a result of Defendant's actions;

g) Attorney fees, expenses, and costs in this action;

h) Punitive damages;

i) Pre-judgment and post-judgment interest;

j) Any other relief available at law or equity; and

k) Such further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all matters so triable.

Respectfully submitted,

/s/Rachel Bussett

Rachel Bussett, OBA #19769Bussett Legal Group, PLLC
2201 N. Classen Blvd.
Oklahoma City, OK. 73106
Phone: 405-605-8073
Fax: 405-212-9112
E-mail: Rachel@BussettLegal.com