## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

RODNEY JONES,
JOHN MCINTOSH
MARCUS BALL,
KELLY JORDAN,
ANTHONY TAYLOR
on behalf of themselves and all others
similarly situated,

      **Plaintiffs,**

v.

LOCAL 798 OF THE UNITED ASSOCIATION
OF JOURNEYMEN AND APPRENTICES OF
THE PLUMBING AND PIPEFITTING
INDUSTRY OF THE UNITED STATES AND
CANADA, AFL-CIO,

      **Defendant.**

**4:20-cv-00585-CRK-CDL**

## <u>OPINION AND ORDER</u>

Before the Court is a motion to dismiss for failure to state a claim pursuant to Federal Rule Civil Procedure 12(b)(6) by Defendant Local 798 of the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO ("Local 798," "the Union," or "Defendant"). See [Def.] Mot. & Br. Supp'n Of Mot. To Dismiss Under [Fed. R. Civ. P. 12(b)(6)] at 1, Sept. 19, 2023, ECF No. 61 ("Def. Mot."). Local 798 seeks to dismiss racial-discrimination claims brought against it by Plaintiffs Rodney Jones, John McIntosh, Marcus Ball, Kelly Jordan, and Anthony Taylor (collectively, "Plaintiffs") under 42 U.S.C. § 1981, and 42 U.S.C. § 2000e ("Title VII") in their Third Amended Class

4:20-cv-00585-CRK-CDL

Action Complaint ("TAC"), Aug. 8, 2023, ECF No. 57.  For the following reasons, Local 798's motion is granted.

## BACKGROUND

The Court presumes familiarity with the facts of this case from this Court's two previous opinions dismissing the complaint in this action without prejudice.  See Jones v. Local 798 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Can., No. 4:20-cv-00585-CRK-CDL, 2022 WL 17417980, at *1 (N.D. Okla. Dec. 5, 2022) ("Jones I"); Jones v. Local 798 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Can., No. 4:20-cv-00585-CRK-CDL, 2023 WL 3666090, at *1 (N.D. Okla. May 25, 2023) ("Jones II").[1]  In Jones I, the Court dismissed Plaintiff Jones' two claims under 42 U.S.C. § 1981 and his claim under Title VII for failure to enforce the National Pipeline Agreement ("CBA") without prejudice.  Jones I, 2022 WL 17417980 at *11–12.  The Court dismissed Mr. Jones' claim for discrimination in advancement under Title VII without leave to amend, as this claim was not properly exhausted before the Equal Opportunity Employment Commission ("EEOC").  See Jones I, 2022 WL 17417980, at *11–12.

Again, in Jones II, this Court held that Plaintiff Jones failed to state a claim for failure to enforce the CBA under Section 1981 because his allegations lacked factual support.  Jones II, 2023 WL 3666090, at *3–7.  Even where he alleged facts,

---

[1]  In the complaint and the second amended complaint, Plaintiff Jones was the only named Plaintiff in the action.  In the TAC, the allegations concern Mr. Jones and other named Plaintiffs against Local 798.

Mr. Jones did not allege: that he pursued a grievance upon which the Union failed to act; that the Union controlled any of the individuals about whom Mr. Jones had alleged facts; or any other facts that would demonstrate the Union's intent to discriminate. Id. at *3–5. Likewise, the Court dismissed Mr. Jones' failure to advance claim because he did not plead any facts that, if proven, could plausibly lead to the inference that the Union intentionally prevented Jones' from advancing. Id. at 5–6. Although Mr. Jones claimed the Union was responsible for his failure to obtain sufficient work hours and letters of recommendation to advance, he pled no facts to support those allegations. Id. at 5. The Court also dismissed without prejudice Mr. Jones's claim that Local 798 failed to enforce the terms of the CBA because Mr. Jones is Black. Id. at 6. The Court dismissed the disparate treatment claim under Title VII for failure to plead intent and noted that Mr. Jones had failed to pursue the disparate impact claim in his second amended complaint. Id.

The TAC includes newly named Plaintiffs: John McIntosh, Marcus Ball, Kelly Jordan, and Anthony Taylor. TAC at ¶¶ 2–5. The TAC asserts that the named Plaintiffs act on behalf of themselves and all others similarly situated. Id. at 1; id. at ¶¶ 202–223. Plaintiffs McIntosh, Ball, Jordan and Taylor, along with Mr. Jones, are the members of the class action suit which arises "out of Plaintiffs' status as Union Members with [Defendant], and the race discrimination they experienced at the hands of Defendant." Pls. Resp. [Def. Mot.] at 2, Nov. 11, 2023, ECF No. 65 ("Pls. Resp."). The TAC re-alleges two claims under Section 1981, as well as his failure to enforce claim under Title VII. See TAC at ¶¶ 224–76. Additionally, Plaintiffs assert

two new claims for race discrimination under Section 1981: Count 4, "Unequal Terms and Conditions of Employment"; and Count 5, "Hostile Work Environment." See Id. at ¶¶ 266–276.

## ALLEGATIONS IN THIRD AMENDED COMPLAINT

Throughout the TAC, as was the case in the First and Second Amended Complaint, Plaintiffs make two types of allegations: (i) conclusory allegations lacking factual content; and (ii) allegations with factual content. Only those allegations containing some factual content are assumed to be true for the purposes of this motion. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); Frey v. Town of Jackson, 41 F.4th 1223, 1232–33 (10th Cir. 2022). General allegations without factual content are insufficient to survive a motion to dismiss. See Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012). Although the Tenth Circuit does not require pleadings to contain any specific facts in particular, "there are certain details the Plaintiff[s] should know and could properly plead to satisfy the plausibility requirement." Id. at 1194. The Court must "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." Id. at 1190.

Here, the TAC makes many assertions which do not contain factual content and therefore, whether or not they are true, the Court cannot presume them to be true for the purposes of this motion. See Khalik, 671 F.3d at 1190 (citing Iqbal, 556 U.S. at 678). For example, the TAC alleges that "the Union Stewards, Business Agents, Organizers, Foreman, Supervisors and Management knowingly and

4

4:20-cv-00585-CRK-CDL

intentionally violated Title VII and Section 1981." TAC at ¶ 48.  Likewise, Unnamed Class Member 3 ("UCM 3") alleges that Black union members "were afraid to report the discrimination or lodge complaints, for fear of retaliation." Id. at ¶ 206:h. As another example, the TAC alleges the Union: "refus[ed] to protect Black members from race discrimination," id. at ¶ 48:e; refused to "report or remedy illegal and discriminatory conduct against Black members in the same manner as it does for White members," id. at ¶ 48:g; and refused "to pursue grievances on behalf of Black members in the same manner as White members." Id. at ¶ 48:h; see also, e.g., id. at ¶¶ 54, 142, 162, 179, 201, 205:a, 205:j, 205:m, 206:I, 245, 269.[2]  Statements such as these or that "White Helpers, Welders, Foremen, Supervisors, Journeymen, and others routinely used racial slurs and derogatory language when speaking to or about Black people," id. at ¶ 205:j, do not provide specific factual content and cannot be presumed true for the purposes of this motion.  See Iqbal, 556 U.S. at 664; Twombly, 550 U.S. at 555; Khalik, 671 F.3d at 1193.

---

[2] Plaintiffs also alleged that the Union: had a "facially neutral promotion policy, that adversely affects Black members," TAC at ¶ 48:b; denied "Black members the benefits of equal terms and conditions of employment," id. at ¶ 48:c; refused "to enforce the anti-discrimination provisions of the [CBA]" or "pursue grievances for black members in the same manner as white members," id. at ¶¶ 48:f, 48:h; refused to allow the same training opportunities for Black members as White members, id. at ¶¶ 48:i–j; refused "to allow Black members the opportunity to bid on or compete for the competitive or preferred jobs," id. at ¶ 48:l; interfered with Black members "acquiring leadership positions within the Union," id. at ¶48:n; and "expos[ed] Black Members to a direct threat of harm and physical violence by White Members based upon their race and membership in a protected class." Id. at ¶ 48:o.

4:20-cv-00585-CRK-CDL

## ALLEGATIONS OF FACT

### Allegations Concerning the Union in General

Defendant Local 798 "is a member organization of the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO." TAC at ¶ 6. Local 798 represents employees with employers, through a CBA. Id. at ¶ 50. The CBA contains a non-discrimination provision that states: "Employer and Union agree that neither of them shall take any action or refuse to take any action which shall discriminate against any individual with respect to his compensation, conditions, or privileges of employment because of the individual's race, age, color, religion, sex, national origin or disability." Id. at ¶ 51. Union members can report the violations to "the employer's on-site representative—the Foreman—and Local 798's on-site representative—the Steward." Id. at ¶ 53.

The TAC alleges that all elected officers, business agents, organizers, and leadership for Local 798 are and have always been White or White-passing men. Id. at ¶¶ 46, 59. Local 798's union members are generally classified into two positions— "Helper" or "Journeyman." Id. at ¶ 61. The position that is the most highly regarded and compensated is that of Journeyman. Id. at ¶ 62. The position of Helper is less highly regarded and compensated at a lower rate than that of Journeyman. Id. at ¶ 63. Defendant Local 798's Handbook advises its members that they can become Journeyman by either becoming a Welder or a Spacer. Id. at ¶¶ 64–66. To become a

4:20-cv-00585-CRK-CDL

Journeyman Welder, a union member must, among other things, complete the following:

a.    Accrue 5,000 hours of Covered Employment;

b.    Complete 3 years of experience in Covered Employment;

c.    Obtain 5 letters of recommendation from Welder or Journeyman Members of the union with whom they have worked directly;

d.    Submit an application and be accepted into the Local 798 Training Center Downhill Welding School;

e.    Complete the Local 798 Training Center Downhill Welding School, certification tests, and pay applicable fees.

Id. at ¶ 65.  To become a Journeyman Spacer, a union member must, among other things, complete the following:

a.    Submit a request to advance or change classification from Helper to Journeyman;

b.    Obtain 5 letters of recommendation from Journeyman Welders or Journeyman Spacers who have witnessed the union member working as a Journeyman Spacer;

c.    Complete 3,000 Helper hours in the last 10 years;

d.    Complete 500 Journeyman hours in a "pipe gang" during the last 2 years that are recorded at Local 798's Office; and

e.    Receive approval to change classifications from Local 798's Business Manager and Financial Secretary-Treasurer.

Id. at ¶ 66.

4:20-cv-00585-CRK-CDL

### Allegations Involving Rodney Jones

Mr. Jones recounts specific instances of racial bigotry to which he has been exposed as a Union member. In 2017 at a job in Detroit, Mr. Jones complained to the Steward when "a co-worker made racist comments to Mr. Jones about Black people being lazy and taking handouts." TAC at ¶ 79. The Steward said he would address it, but did nothing. Id. In 2018 he told Union Representative W.P. of the presence of a noose at a jobsite to W.P.[3] Id. at ¶ 80. No meaningful action was taken. Id.

In 2019, Mr. Jones was a Helper to Journeyman Welder C.N. at a jobsite in Indiana. Id. at ¶ 81. "[C.N.] would taunt Mr. Jones with racial slurs," and "tell Mr. Jones that the Union used to not allow Black individuals within its ranks," id. at ¶ 115; C.N told Mr. Jones "the Union makes it tough" on Black people, and that he did not want to work Jones, which "Plaintiff has reason to believe this was based upon [Jones'] race." Id. at ¶ 82. Mr. Jones specifically complained about Welder C.N and asked not to work with him. Id. at ¶ 114.

Journeyman Spacer C.S. habitually made Black and racist jokes in Mr. Jones' presence of which the Steward was aware but did nothing to remedy. Id. at ¶¶ 85, 117. At the same jobsite Mr. Jones told the Steward that another Welder Helper, A.G., used the N-word while around Mr. Jones. Id. at ¶ 83. The Steward did not do anything in response. Id. "Mr. Jones is unaware of any Steward on any job he has worked taking action to enforce the CBA's non-discrimination provisions, including

---

[3] Throughout the TAC, various individuals are named. Given the current procedural posture of this matter, the Court references these individuals by their initials.

filing a grievance against, or otherwise imposing consequences on, a White employee for racist conduct." Id. at ¶ 87.

When Mr. Jones was attempting to advance within the Union, "he contacted or attempted to contact every Foreman he ever worked with in the Union for a letter to support his promotion," without success. Id. at ¶ 120.  By March 2017, Mr. Jones "had completed 3 years and 5,000 hours of covered employment—thereby meeting two of the requirements to become a Journeyman Welder." Id. at ¶ 89.  On March 26, 2017, he sent an email to the Union "requesting an application to attend the Local 798 Training Center Downhill Welding School." Id. at ¶ 90.  He received the application and form letters of recommendation and a letter telling him that he needed 5 letters from "a Welder or Welder Foreman" even though "the Union's handbook requirements [] permit letters of recommendation from Welders or Journeyman (Spacer)." Id. at ¶¶ 90–91.  Mr. Jones requested letters from more than 10 individuals but did not receive any letters.  Id. at ¶ 94.

 "Mr. Jones called Local 798's Welding School and was discouraged from continuing to advance," being told that the training was costly and took years to complete.  Id. at ¶ 95.[4]  Mr. Jones sought guidance from Local 798's Financial Secretary-Treasurer [W.P.] on how to advance Id. at ¶ 97.  W.P. suggested that Mr. Jones pursue the requirements necessary to become a Journeyman Spacer. Id. at ¶

---

[4]  The TAC alleges that "the Welding School frequently assists and admits White union members who seek advancement within the union," TAC at ¶ 95, but provides no factual content to support this allegation.

4:20-cv-00585-CRK-CDL

98.  Mr. Jones attempted to fulfill the required hours, but his requests were routinely denied.  Id. at ¶ 100.[5]

Mr. Jones alleges he expressed his frustration to the Union.  Id. at ¶ 102.  In July 2018, Mr. Jones emailed Local 798's business agent C.Y. and explicitly expressed his concerns.  Id. at ¶ 103.  C.Y. responded but did not help in a meaningful way.  Id.[6]

In 2017 Mr. Jones approached a Steward about becoming a pipe inspector.  Id. at ¶ 126.  Mr. Jones took time off from work to obtain the necessary training.  Id. at ¶ 127.  Even though Mr. Jones was required to take time off to complete the training, the Union neither paid for Mr. Jones' training nor paid Mr. Jones during his attendance.  Id.  "When Mr. Jones returned from training, the same Steward who told him that he would be promoted to Inspector told him that he would not be eligible to be an Inspector."  Id. at ¶ 128.  Further, "[w]hen Mr. Jones asked to be paid for the time he was at training and reimbursed for the cost of the training the Steward told him no."  Id. at ¶ 129.  Two White Union Members who started at the same time as Mr. Jones in 2006, J.W. and J.C., were both promoted past Mr. Jones despite his similar efforts.  Id. at ¶ 118.

---

[5] The TAC further alleges that "White Helpers seeking advancement were routinely assisted and given the required hours."  TAC at ¶ 100.  He and other Black members "were regularly given less than desirable positions and duties such as janitorial duties, picking up metal shavings, and pre-heating welds."  Id. at ¶ 101.  The TAC provides no factual content for either of these allegations.

[6] Without providing any factual content, Mr. Jones claims he witnessed White workers with less knowledge and experience advance to the role of Journeyman without having to meet the same requirements he was told to fulfill.  TAC at ¶ 106.

4:20-cv-00585-CRK-CDL

On October 22, 2019, Mr. Jones executed a charge with the EEOC, alleging "[Defendant] discriminated against him on the basis of his race in violation of Title VII." Id. at ¶ 135. On August 17, 2020, the EEOC mailed a Notice of Right to Sue letter. Id. at ¶ 136. Suit was properly commenced on November 16, 2020. Id. at 137–38.

**Allegations involving John McIntosh**

The TAC alleges that Plaintiff John McIntosh has been a member of the Union since November of 2008. TAC at ¶ 2. Mr. McIntosh experienced various instances of racial bigotry. Id. at ¶¶ 139:a–140:g.[7] In 2018, while working for Michels Corporations, Mr. McIntosh saw a T-shirt taped to a pipe with the words "'African Vibrations' in a font that looked like the letters were made of bones," id. at ¶ 139:a, with "exaggerated black stick figures depicting Africans wearing African jewelry with

---

[7] The face of the complaint reveals that some of the allegations made by Mr. McIntosh are beyond the statute of limitations. TAC at ¶¶ 140:a–d, f–g. For example, On July 19, 2014, at a jobsite in Coldwater, Michigan, a White member intentionally threw a rock at McIntosh which hit him in the head. Id. at ¶ 140:b. No assistance or medical treatment was offered. Id. The incident was reported to Union Pipeman S.P who neither investigated nor took action against the White Member. Id. Mr. McIntosh "requested that action be taken against the White Member" but [S.P.] refused to do so. Id. Foreman B.F. and Pipeman S.P. told Mr. McIntosh "the injury must have happened from him getting into a fight the previous night." Id. Mr. McIntosh alleges that he filed a complaint for the incident, but the Union took no action. Id. Mr. McIntosh alleges he is now partially blind in one eye due to that incident. Id.

In November 2014, at a job site in Montrose, Pennsylvania, a White member used the word N-word while speaking with other White members. Id. at ¶ 140:c. Mr. McIntosh reported the conduct to the Steward. Id. The next day, Mr. McIntosh alleges he was told to "[s]hut [t]he [f]uck [u]p and never talk about it again," and that "if he didn't like it he could quit." Id. Shortly after the incident, Mr. McIntosh was told by White Welder Foreman J.D. and White Steward, D.S. to "[l]eave because you quit." Id. When Mr. McIntosh refused to leave, the Assistant Spreadman called the police and threatened to have him arrested. Id.

4:20-cv-00585-CRK-CDL

African drums." Id.  He reported the offensive conduct to a pipeman, who told the foreman, who ripped it off the pipe and said, "there I took care of it." Id. Mr. McIntosh asked that action be taken about the offensive shirt, but no action was taken.  Id. When he threatened to report the foreman, the foreman threatened to fire him for not wearing protective gear.  Id. at ¶ 139:b.  Mr. McIntosh reported the conduct to Business Agent C.Y., who took no action to protect Mr. McIntosh.  Id. at ¶139:b. Rather, C.Y. "agreed that the shirt 'could be offensive,' but because no one admitted responsibility, he refused to do anything further about the conduct." Id.  C.Y. then told Mr. McIntosh that he would be fired if he did not return to work.  Id.  Mr. McIntosh reported the offensive conduct to a Michels Corporation Human Resources Department, who told him that he "shouldn't be offended by the shirt" and to return to work. Id. at ¶ 139:c.

In January 2017, at a job site in Cusetta, Alabama, a White co-worker intentionally attempted to hit McIntosh with a car.  Id. at 140:e.  The White member yelled profanity at Mr. McIntosh and intentionally drove over his propane bottle.  Id. Welder Foreman B.C. removed Mr. McIntosh from the job while the White member suffered no consequences.  Id.  Mr. McIntosh alleges he reported the incident to Local 798's Steward, "who said both Mr. McIntosh and the White member would be written up."  Id.  McIntosh was fired the next day; the White member was "only written up." Id.

**Allegations Involving Marcus Ball**

Plaintiff Marcus Ball has been a member of Local 798 from 2004 to 2022, leaving due to lack of advancement and continuous racial discrimination within Local 798.  TAC at ¶¶ 143–144.  Mr. Ball alleges that although he was a helper for his entire membership with Local 798, he was allowed to work as a Journeyman when working with other local unions.  Id. at ¶ 145–46.  "During his membership with Local 798, he would work with other Local Unions that were not 798 and he was allowed to work as a Journeyman in Building Trades but not on Pipeline work with Local 798."  Id.  He alleges he never had the opportunity to work a full 2080 hours per year and was often the only Black Helper on a job site.  Id. at ¶¶ 148, 150.

**Allegations Involving Kelly Jordan**

The TAC alleges that Plaintiff Kelly Jordan is a Black male residing in Irontown, Pennsylvania. TAC at ¶ 163.  Mr. Jordan has been a member of the Local 798 since 2007.  Id.  Mr. Jordan alleges that he is an active Member of Local 798, but that despite 16 years of Union Membership and despite his efforts, he has been denied journeyman training while other individuals received such training.  Id. at ¶¶ 164–166.[8]  Jordan and his sister both worked a Local 798 job in which the supervisor would say racist things at a daily "safety meeting including."  Id. at ¶ 169.  Statements at such meetings included: "We aren't gonna let these fucking

---

[8]  Mr. Jordan alleges facts with respect to one incident that the complaint reveals is outside of the statute of limitations: "In his first year of membership with the Union, Jordan was threatened with a gun" by White Welder N.B., who was dismissed from the job site but not from the Union.  TAC at ¶ 167.

people, darkheads take our fucking jobs." Id. Mr. Jordan alleges that he was assaulted by a White Worker on the same day that the previous statement was said, and that he contacted a business agent. Id. The Business Agent responded that Mr. Kelly could "file charge if [he] want[ed]," but that "his tone of voice and mannerisms [indicated] that nothing would happen and he was at risk if he did." Id. Mr. Jordan alleges that his sister was "so scared that she left the Union," and that Mr. Jordan was also "afraid for his life and his job so he did not report the incident."[9] Id. at ¶ 169–70.

### Allegations involving Anthony Taylor

Plaintiff Anthony Taylor is a Black man residing in Nashville Tennessee. TAC at ¶ 180. He was a Helper during his entire membership. Id. at ¶ 182. He never had "the opportunity to work a full 2080 hours per year." Id. at ¶ 184. He was often the only Black Helper on a job site. Id. at ¶ 186. "Out of fear for his safety and his ability to provide for his family," Mr. Taylor claims he "did not report the things that happened to him or the things he saw happen to others." Id. at ¶¶ 193–94. Mr. Taylor worked his last job for Local 798 in 2021. Id. at ¶ 196. "For a year prior to leaving the Union, Taylor was unemployed for a year while White Helpers with the same or less experience were hired over him for jobs that he was qualified to hold." Id. at ¶

---

[9] Other allegations involving Mr. Jordan are conclusory or without factual content. For example, Mr. Jordan alleges that it was "common knowledge" that in response to any report or pursuit of a grievance, "Management would actively avoid pursuing the claims and that you would be retaliated against." TAC at ¶ 176. "The times that Jordan tried to report the discrimination he was directly and indirectly told nothing would happen and that he was at risk if he pursued it." Id. at ¶ 177.

4:20-cv-00585-CRK-CDL

198.   Taylor alleges that "[e]arly in his career with the Union Taylor and a White Helper were both late to the job site.  The White Helper kept his job and Taylor was terminated." Id. at ¶ 189.

**Allegations of Unnamed Class Members[10]**

**Unnamed Class Member 1**

A Black Helper filed a grievance that a White Welder "repeatedly threatened to assault and kill him on the job due to his race." TAC  at ¶ 202.  The White Member also threatened the Black Helper's job, used pejorative race-based names, and made other racial slurs while on the job site.  Id. at ¶ 203.  The Black Helper was terminated, and the white Welder kept his job.  Id. at ¶ 204.

**Unnamed Class Member 2**

A Union member since 2017, Unnamed Class Member 2 ("UCM 2") reported a specific incident of isolation occurred when the Foreman assigned all Black members to work with the preheating pipe, a job that allowed little opportunity for workers to interact with Pipeline employees and obtain contract jobs.  Id. at ¶ 205:f.  Although Black Helpers working on the preheating jobs specifically requested opportunities to work with welders and Pipeline employees, they were denied the opportunity to do so.  Id. at ¶ 205:f–h.  However, White Helpers with similar or less experience than

---

[10]   All unnamed class members experienced various instances of discriminatory behavior, including racist and derogatory jokes, comments about Black speech and culture, racist names and comparisons, and public writings of the N-word in work environments.  TAC ¶ 207:a–g.

15

4:20-cv-00585-CRK-CDL

Black Helpers were allowed to work with the welders without having to ask. Id. at ¶ 205:i.[11]

UCM 2 alleges that White workers made joking comments using the N-word and that Black members were afraid to speak about what was happening due to fear of retaliation, including termination and that White workers used the N-word around him. Id. at ¶ 205:l–o.  On another occasion, UCM 2 and another Black worker were forced to lie in trash strewn about the work area while White Welders and their Helpers laughed. Id. at ¶ 205:p.  It is alleged that the described conduct occurred regularly and in front of all levels of management.  Id. at ¶ 205:q.  The Foremen, Supervisors, Stewards, Welders, and Journeymen were aware of this discrimination, did not intervene, and ultimately encouraged the behavior.  TAC ¶ 205:r.

---

[11]  UCM 2 also makes several allegations which do not contain factual support, stating: there were numerous incidents of harassment, discrimination, and failure of the Union to take action to protect him and others; he has been treated harshly, unfairly, and differently than other members by White Union members from every echelon of management; he has experienced discrimination so severe that he questioned whether continuing to work for the Union would be detrimental to his mental health due to the harassment he experienced at work every day; and that Black members were intentionally prohibited from developing relationships needed to advance.  TAC at ¶ 205:a–c.  He also alleges that White Helpers, Welders, Foremen, Supervisors, Journeymen, and others routinely used racial slurs and derogatory language when speaking about Black people, id. at ¶ 205:j, and that he was aware that if he reported the racial slurs he would face retaliation by being fired or denied future job opportunities, and that the Union Stewards were aware that this behavior was happening.  Id. at ¶ 205:k.  He alleges generally that White Helpers were paid full-scale, "while Black members on the same job, with the same experience, and longer tenure with the Union were paid less."  Id. at ¶ 205:o.

4:20-cv-00585-CRK-CDL

### Unnamed Class Member 3

Unnamed Class Member 3 ("UCM 3"), a Union member since 2006, makes a number of allegations, one of which is clearly beyond that statute of limitations and other which lacks factual content.[12]   On one occasion, UCM 3 and another Black woman worker were humiliated on a job for not buffing the pipe fast enough and removed from the assignment.  Id. at ¶ 206:f.

## JURISDICTION AND STANDARD OF REVIEW

The Court exercises jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, and reviews Defendant's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Pursuant to Rule 12(b)(6), the Court is tasked with determining "whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief may be granted."  Broker's Choice of Am., Inc. v. NBC Universal, Inc., 757 F.3d 1125, 1135 (10th Cir. 2014) (internal citations

---

[12]  For example, in 2015, while working on a job in Missouri, UCM 3 was pulled off a line to allegedly train for another position but was told he was too short to complete his present job while white women shorter than he were allowed to work on the line. TAC at ¶ 206:a.  UCM 3 was not given any work, told there was no work for him to do, and he was released from the job along with another Black woman worker.  Id. at ¶ 206:b–c.  The Union Foreman objected to UCM 3 receiving unemployment benefits after termination.  Id. at ¶ 206:d.

Further, UCM 3 makes allegations without factual content that Black women workers—and never White women workers—were assigned to physically demanding jobs.  Id. at ¶ 206:e.  Black men and women were constantly subject to racist jokes and ridicule in front of and by management without intervention.  Id. at ¶ 206:g.  UCM 3 and others affected were afraid to report the discrimination or lodge complaints for fear of retaliation.  Id. at ¶ 206:h.  Young Black men were subject to the worst treatment under the most demanding conditions and still received less pay than similarly qualified and tenured white workers doing less strenuous work.  Id. at ¶ 206:i.

4:20-cv-00585-CRK-CDL

omitted).  A complaint is legally sufficient if it contains factual allegations such that it states a plausible claim for relief on its face.  Twombly, 550 U.S. at 570.  Although a complaint need not contain detailed factual allegations, it nevertheless requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555 (internal citation omitted).

A claim is facially plausible when the plaintiff pleads factual content allowing the Court to draw reasonable inferences that the defendant is liable for the alleged misconduct.  Iqbal, 556 U.S. at 678.  The Court must accept all well-pleaded factual allegations of the complaint as true.  Twombly, 550 U.S. at 555–56.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  When deciding a motion to dismiss, the Court considers the complaint in its entirety, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) (internal citation omitted).

"To avoid dismissal, 'a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face.'"  Hampton v. Bakery, Confectionery & Tobacco Workers & Grain Millers Int'l Union of Am., Loc. 218, AFL-CIO, No. 21-3218, 2022 WL 4361782, at *2 (10th Cir. Sept. 21, 2022) (citing Khalik, 671 F.3d at 1191).  The Court will "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable."  Id. (internal quotations and citations omitted).

18

## DISCUSSION

Pursuant to Section 1981, "all persons" are guaranteed the right to "make and enforce contracts." 42 U.S.C. § 1981(a). Plaintiffs allege that the Union has violated both Section 1981 and Title VII, invoking what they call a pattern of discriminatory conduct amounting to a continuing violation, attributed to the Union against the five named plaintiffs and unnamed class members over a period of twenty years. TAC at ¶¶ 1–5. Plaintiffs allege race discrimination against the Union in counts one and three for failure to enforce the CBA under Section 1981 and 42 U.S.C. § 2000e, respectively. Id. at ¶¶ 224–35, 254–64. The remaining three counts, all of which are brought under Section 1981, allege: (ii) failure to promote, (iv) unequal terms and conditions of employment, and (v) hostile work environment. Id. at ¶¶ 236–53, 266–76. Defendant argues that many of the allegations in the TAC are beyond the statute of limitations. Def. Mot. at 10. Defendant also argues that the allegations are not against the Union itself, but against individual members of the Union and various employers, which cannot be attributed to Defendant. Id. at 11–12. Further, the Union claims many of the allegations lack factual content and are insufficient to demonstrate the Union's intent to discriminate. Id. at 1, 10, 15.

## I.   The Statute of Limitations

As a preliminary matter, the parties dispute which allegations can be considered by the Court in considering this motion to dismiss. Defendant asserts that any allegations prior to November 17, 2016, should not be considered by the Court. Def. Mot. at 15. Plaintiffs counter that the statute of limitations is an affirmative

4:20-cv-00585-CRK-CDL

defense that should not be considered at this stage in the litigation, and that in any event the continuing violation doctrine allows Plaintiffs to rely upon allegations beyond the statute of limitation.  Pls. Resp. at 10–11.

The statute of limitations is an affirmative defense that is ordinarily raised and addressed in pleadings, rather than on motion.  Sierra Club v. Okla. Gas & Elec. Co., 816 F.3d 666, 671 (10th Cir. 2016).  Nonetheless, when it appears from the face of the complaint that an allegation is beyond the statute of limitations, a party may raise the matter on motion.  Id.  The statute of limitations under Section 1981 runs four years from when the cause of action accrued.  Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 374, 382–83 (2004) (holding federal statute 28 U.S.C. § 1658 created four-year "catch-all" statute of limitations).[13]  Here, the face of the complaint reveals that a number of the allegations are clearly beyond the statute of limitations, and those allegations should normally not be considered when determining whether Plaintiffs have stated a claim.  However, where the date of the allegation is not disclosed on the face of the complaint, the Court will assume that those allegations occurred within the statute of limitations for the purposes of this motion.  See SFF-TIR, LLC v. Stephenson, 250 F. Supp. 3d 856, 997 (N.D. Okla. 2017) (noting that unless a complaint pleads specific dates, the Court will not resolve the statute of limitations issue on a motion to dismiss).

---

[13]  A Title VII plaintiff must file her lawsuit within 90 days of receiving her right-to-sue notice from the EEOC, 42 U.S.C. § 2000e-5(f)(1), after having brought charges with the EEOC within either 180 or 300 days depending upon the circumstances.  See 42 U.S.C. § 2000e–5(e)(1).

4:20-cv-00585-CRK-CDL

In Title VII suits, the continuing violation doctrine may allow a plaintiff to rely on discriminatory acts occurring before the limitation period, where the plaintiff identifies an ongoing discriminatory practice rather than only discrete acts of discrimination such as termination, failure to promote, denial of transfer, or a refusal to hire.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114–115 (2002).  The continuing violation doctrine applies only to Title VII claims—not Section 1981 claims.  Thomas v. Denny's, Inc., 111 F.3d 1506, 1514 (10th Cir. 1997) (holding that "because the continuing violation theory is a creature of the need to file administrative charges, and because a section 1981 claim does not require filing such charges before a judicial action may be brought, the continuing violation theory is simply not applicable").

Even when the doctrine is applied in the Title VII context, a plaintiff must still plead a link between the pre- and post-limitation conduct for the doctrine to apply. The Tenth Circuit has explained that a Title VII hostile work environment claim may be composed of "a series of separate acts that constitute one 'unlawful employment practice.'" Hansen v. SkyWest Airlines, 844 F.3d 914, 923 (10th Cir. 2016) (discussing Morgan, 536 U.S. at 115, 117).  To determine whether acts should be considered as part of actionable hostile work environment practice, the Court must consider whether the pre- and post-limitations period acts were "related by type, frequency, and perpetrator."  See Duncan v. Manager, Dep't of Safety, City & Cty. Of Denver, 397 F.3d 1300, 1309 (10th Cir. 2005); see also Tademy v. Union Pac. Corp., 614 F.3d

21

4:20-cv-00585-CRK-CDL

1132, 1144 (10th Cir. 2008) (emphasizing that inquiry must be made into whether the acts occurred when the claimant "was working in the same place.")

Here, the complaint reveals that many of the allegations are beyond the statute of limitations and that Plaintiffs' invocation of the continuing violation doctrine is misplaced. Plaintiffs fail to allege facts which might lead to the plausible inference that the incidents, which from the face of the complaint are clearly beyond the limitations period, have any relationship to post-limitations allegations.[14] For example, the TAC alleges in 2010, at a job site in Miles City, Montana, a Black member was verbally accosted by a White member and then harassed by a foreman. TAC at ¶140:a. This Black member filed a grievance, but no action was taken. Id. In 2014, at a job site in Coldwater, Michigan, Plaintiff McIntosh was struck in the eye by a rock thrown by a White member and asked that action be taken, but the

---

[14] A plaintiff may counter a motion to dismiss with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute. Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030, 1049 (D.N.M. 2016). The applicability of tolling often implicates matters outside the pleadings, and thus some courts have indicated that a Rule 12(b)(6) motion will rarely be granted if equitable tolling is involved because review is limited to the complaint. Sender v. Dillow, No. 13-2170-RDR, 2013 WL 12253548, at *2 (D. Kan. Aug. 30, 2013) (citing Huynh v. Chase Manhattan Bank, 465 F.3d 992, 1003–04 (9th Cir. 2006)). The Tenth Circuit has not clarified whether tolling must be pled with supporting facts in the complaint or may be merely argued in response to the motion. Am. Mech. Sols., L.L.C., 184 F. Supp. 3d at 1049; cf. Kincheloe v. Farmer, 214 F.2d 604, 605 (7th Cir. 1954) (holding that a plaintiff must "extricate himself" from a pleading that, on its face, indicates the statute of limitations bars the action by pointing to facts which might show the applicability of an exception in the complaint or an amendment). In any event, where the face of the complaint reveals that the action is beyond the statute of limitations, and there are no allegations in the complaint or response to the motion that would implicate tolling, the complaint may be disposed of on a motion to dismiss. See Jones v. Bock, 549 U.S. 199, 215 (2007).

4:20-cv-00585-CRK-CDL

Union took no action.  Id. at ¶140:b.  Although in both instances the TAC alleges discriminatory conduct by another union member, and some complaint made by the individual involved, no allegations connect these separate events to each other or any other allegation in the post-limitations period other than Mr. McIntosh's involvement in the 2014 incident.

No allegations connect these incidents to Mr. Jones' Title VII claim.  Mr. Jones bases his claims upon events from jobs taking place in Detroit in 2010–2011 and 2017, and Indiana in 2019.  Id. at ¶¶ 79, 81, 122.  No allegations identify facts from which one could plausibly infer a pattern or policy of the Union not to intervene.   The doctrine cannot apply where there is no allegation supporting a relationship between the events.  See Hansen, 844 F.3d at 923 (stating that offending acts must be "part of the same actionable hostile work environment practice" (internal citations and quotations omitted)).

## II.    Claims Under Section 42 U.S.C. § 1981

Plaintiffs claim the Union intentionally failed to enforce the anti-discrimination provision of the CBA, imposing advancement requirements to thwart Plaintiffs' promotion, maintaining unequal working conditions, and creating a hostile working environment.  TAC at ¶ 48:f.  Defendant argues Plaintiffs fail to allege facts sufficient to satisfy the intent requirement of Section 1981.  Def. Mot. at 10–11.  For the reasons that follow, Plaintiffs fail to allege sufficient factual content to plausibly demonstrate that the Union engaged in intentionally discriminatory behavior.

A.    **Failure to Enforce Terms of the CBA Under 42 U.S.C. § 1981 (Count I)**

Section 1981(a) guarantees the right "to make and enforce contracts" and "the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  Pursuant to 42 U.S.C. § 1981, an employer may not discriminate against an employee on the basis of race.  To establish a prima face case under Section 1981, the plaintiff must demonstrate (1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in Section 1981.  Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1101 (10th Cir. 2001); Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020); Cruz v. Farmers Ins. Exch., 42 F.4th 1205, 1210 (10th Cir. 2022).

For a Section 1981 claim against a Union, a plaintiff must plead facts that would plausibly demonstrate the Union was more than passively acquiescent in the discrimination of others.  See York v. American Tel. & Tel. Co., 95 F.3d 948, 956–57 (10th Cir. 1996) ("[Under Title VII], mere inaction does not constitute acquiescence").  Although a plaintiff must plead sufficient facts to make the claim plausible, Twombly, 550 U.S. at 570, a plaintiff is not required to specifically allege all the elements of a prima facie case of discrimination.  See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002); Khalik, 671 F.3d at 1192.  Nevertheless, "the elements of each alleged cause of action help to determine whether [the] [p]laintiff has set forth a plausible claim."  Khalik, 671 F.3d at 1192.  "[G]eneral assertions of discrimination and retaliation, without any details whatsoever of events . . . are insufficient to

24

survive a motion to dismiss.  While 'specific facts are not necessary,' some facts are." Id. at 1193 (quoting Erickson v. Pardus, 551 U.S. 89, 93 (2007)).  Thus, the plaintiff must plead facts that the Union instigated or actively supported the discriminatory acts.  See Goodman v. Lukens Steel Co., 482 U.S. 656, 669 (1987), superseded by statute on other grounds, 28 U.S.C. § 1658, as recognized in R.R. Donnelley & Sons Co., 541 U.S. 369; York, 95 F.3d at 956–57; see also Carter v. Chrysler Corp., 173 F.3d 693, 703–04 (8th Cir. 1999).

Although a plaintiff states a claim against a union when it alleges facts that indicate a union made a categorical decision to ignore grievances because of race, Goodman, 482 U.S. at 666–69, union liability must be "predicated on the union's conduct, not merely on discrimination by the employer."  See Anspach v. Tomkins Indus., Inc., 817 F. Supp. 1499, 1517 n.6 (D. Kan. 1993), aff'd sub nom.  Anspach v. Sheet Metal Worker's Int'l Ass'n, 51 F.3d 285 (10th Cir. 1995); see also Faragalla v. Douglas Cnty. Sch. Dist., No. 07-cv-02584-REB-BNB, 2009 WL 2902737, at *9–10 (D. Colo. 2009) (explaining that a union did not discriminate against an employee when it refused to arbitrate her claim due the insufficiency of the claim).  Thus, although a "union cannot acquiesce in a company's prohibited employment discrimination and expect to evade liability for such discrimination," York, 95 F.3d at 956 (citing Romero v. Union Pac. R.R., 615 F.2d 1303, 1311 (10th Cir. 1980)), "mere inaction does not constitute acquiescence."  Id. at 957 (citing Goodman, 482 U.S. at 669).  Accordingly, to survive a motion to dismiss the plaintiff must allege facts from which a jury could

infer that there were actions or decisions by the union to intentionally deprive the plaintiff of his or her rights.[15]  See id.

A consensus of federal and state authorities hold that a union may only be held liable for failing to pursue a grievance complaint for discriminatory reasons.  See EEOC v. Pipefitters Ass'n Local Union 597, 334 F.3d 656, 660 (7th Cir. 2003) (rejecting argument that union has affirmative duty to investigate and rectify discrimination); Thorn v. Amalgamated Transit Union, 305 F.3d 826, 832–33 (8th Cir. 2002) (holding that because employee did not ask the union to file a grievance, the union had no duty to remedy sexual harassment);  Anjelino v. New York Times Co., 200 F.3d 73, 95–96 (3d Cir. 1999) (holding union was not liable because it did not instigate or actively support the discrimination and the employer was responsible for assigning work and ensuring a discrimination-free workplace); Chrysler Corp., 173 F.3d at 703–04 (stating a labor organization is liable for an employer's discrimination in the workplace if it causes or attempts to cause the employer to discriminate under § 2000e–2(c)(3) or if the union "purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer"(internal citations omitted)); cf. York, 95 F.3d at 956 (adopting acquiescence theory but noting "mere inaction does not constitute acquiescence" and requiring "(1) knowledge that prohibited discrimination may have occurred and (2) a decision not to assert the

---

[15]  Although the facts alleged in support of such intentional conduct may be of direct or circumstantial evidence of intent, see Cruz, 42 F.4th at 1210; Perry v. Woodward, 199 F.3d 1126, 1134 (10th Cir. 1999), the allegations cannot be conclusory.  Hampton, 2022 WL 4361782, at *2 (citing Khalik, 671 F.3d at 1191).

discrimination claim"); <u>Douglass v. United Auto Workers, Loc. 31</u>, 368 F. Supp. 2d 1234, 1247 (D. Kan. 2005), <u>aff'd sub nom.</u> <u>Douglass v. United Auto Workers Loc. Union 31</u>, 188 F. App'x 656 (10th Cir. 2006) (holding that the plaintiff failed in her burden to provide specific facts showing that a genuine issue for trial existed when she never attempted to file any grievance with regard to her job placements); <u>Badlam v. Reynolds Metals Co.</u>, 46 F. Supp. 2d 187, 201 (N.D.N.Y. 1999) (finding that the union was under no obligation to take further action because the plaintiff did not pursue a grievance regarding her sex discrimination accusations); <u>Ellison v. Plumbers & Steam Fitters Union Loc. 375</u>, 118 P.3d 1070, 1076 (Alaska 2005) (ruling that female union member who never requested to file a grievance failed to show the union discriminated against her through its inaction in the face of knowledge of discrimination by her employer and some union stewards). <u>Contra</u> <u>Howard v. Int'l Molders & Allied Workers Union</u>, 779 F.2d 1546, 1548, 1553 (11th Cir. 1986) (holding union liable for failing to use "all reasonable effort" to end employer's use of racially discriminatory test for promotion, although no members had asked union to pursue grievances).

Thus, even though an employer may be liable for the failure to remediate discrimination, courts have not imposed an affirmative duty on unions to investigate and remediate discrimination. <u>See</u> <u>EEOC v. Pipefitters Ass'n Local Union 597</u>, 334 F.3d at 656. In <u>EEOC v. Pipefitters Ass'n Local Union 597</u>, the Seventh Circuit explained why courts hold unions and employers to different standards:

4:20-cv-00585-CRK-CDL

> An affirmative duty of the union to investigate and rectify discrimination by the employer derives no support from the statutory language, as we have seen, and fills no gap in the remedial scheme that the statute creates. Imposing such a duty would make for factually messy cases because the union's power is so much more limited than the employer's when it comes to making changes in personnel or work rules.

Id. at 660–61. The Seventh Circuit identified two types of cases "in which selective inaction by a union might be thought a form of discrimination." Id. at 661. First, where "the union is vigilant to detect and correct mistreatment of white workers but has a policy of ignoring the interests of black ones." Id. This situation would arise, for example, where a union would refuse to grieve a complaint for a Black member that it would grieve for a White member. Id. (first citing McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 284–85, (1976); then citing York, 95 F.3d at 956; and then citing Steele v. Louisville & Nashville R.R., 323 U.S. 192, 202–04, (1944)). Alternatively, a union that adopted as policy "not to grieve complaints of discrimination by [B]lack members of the bargaining unit because the company is hostile to such complaints and the union fears that this hostility will make it harder for the union to succeed in its dealings with the company." Id. (citing Goodman, 482 U.S. at 668–69).

Accepting the factual content in the complaint as true, Plaintiffs fail to allege sufficient facts that would plausibly support a claim that the Union intentionally failed to enforce the terms of the CBA. It is undisputed that Plaintiffs plead membership in a protected class. See Def. Mot. Dismiss [Re Jones II] at 9, Dec. 05, 2022, ECF No. 40. However, to allege the requisite intent to survive a motion to dismiss, Plaintiffs must allege (1) facts that establish the Union's knowledge that

28

4:20-cv-00585-CRK-CDL

prohibited discrimination may have occurred and (2) a decision not to assert the discrimination claim. York, 95 F.3d at 956–57 (holding that without evidence of the defendant's knowledge of the alleged discrimination, mere failure by the defendant to file a discrimination claim on the plaintiff's behalf is insufficient to establish a Title VII claim).

Although Plaintiffs plead facts relating to certain individual's discriminatory intent, they have failed to plead facts from which a jury could conclude that the Union intended to discriminate against Plaintiffs either specifically or through a pattern and practice of conduct. The claims fail to demonstrate that the Union either: did not pursue grievances that it would have or did pursue for White members; or that it had a policy of not pursuing grievances for Black members. Mr. Jones alleges that racist comments have been directed towards him by his co-workers but fails to allege that he pursued a grievance with the Union for any of these incidents. TAC at ¶ 79. Mr. Jones alleges the steward told him he "'would take care of it' but nothing was done." Id. Mr. Jones alleges he told a union representative about a noose at a jobsite, but that no investigation ensued. Id. at ¶ 80. Mr. Jones alleges he complained about another union member, C.N., who would taunt him with racial slurs and tell him that "the Union makes it tough" for Black people. Id. at ¶ 81. He alleges he told the steward about another union member, A.G., who used the N-word while around Mr. Jones, but that no action was taken. Id. at ¶ 83. Mr. Jones does not allege he filed a grievance for any of these incidents.

4:20-cv-00585-CRK-CDL

Likewise, Mr. McIntosh alleges discriminatory treatment by other union members but does not allege that he filed a grievance for any of the incidents.  In 2018, Mr. McIntosh was exposed to an offensive shirt worn by another union member about which he complained to a foreman at the site and asked action be taken—but no action was taken.  Id. at ¶139:a.  When he threatened to report the foreman, the foreman threatened to fire him for not wearing protective gear.  Id. at ¶ 139:b.  Mr. McIntosh reported this incident to Business Agent C.Y., who took no action to protect McIntosh.  Id. at ¶ 139:b.  Mr. McIntosh also reported the offensive conduct to Human Resources at Michels Corporation, who told him "he 'shouldn't be offended by the shirt' and to go back to work."  Id. at ¶139:c.  Mr. McIntosh alleges "[n]o one with the Union or the Union Partner took any corrective action to protect McIntosh from the offensive environment."  Id. at ¶139:d.  In January 2017, at a job site, a White co-worker intentionally attempted to hit Mr. McIntosh with a car and yelled profanity at him.  Id. at ¶ 140:e.  The Foreman removed Mr. McIntosh from the job "and did nothing to the White member."  Id.  Mr. McIntosh reported the incident to the steward, who "said both [Mr. McIntosh] and the White member would be written up," and although the White member was indeed written up, Mr. McIntosh was fired.  Id.  Mr. McIntosh does not claim to have pursued a grievance for any of these alleged incidents.

Mr. Jordan does not allege that he filed any grievance but does allege that it was "common knowledge" that management "would actively avoid pursuing grievances."  Id. at ¶ 176.  Mr. Jordan alleges that other workers said racist things

4:20-cv-00585-CRK-CDL

and that he was assaulted by another member, but he does not allege he pursued a grievance for any of these alleged incidents.

One Unnamed Class Member alleges that a White welder threatened to kill him, and others used pejorative race-based names and made other slurs towards him. Id. at ¶¶ 202, 203.   Other unnamed class members report being harassed and discriminated against.  Id. at ¶ 205.  The Unnamed Class members do not allege that they filed a grievance with respect to these incidents.

In only one instance does the TAC allege that a member filed a grievance.  The TAC alleges that on information and belief a Black Helper recently filed a grievance "that a White Member repeatedly threated to assault and kill him on the job due to his race." Id. at ¶ 202.  The TAC provides no further information about the grievance or whether it was pursued by the Union or not, although it does say that the Black Helper was terminated from the job.  Id. at ¶ 204.

Although Plaintiffs allege abhorrent and vile conduct on behalf of other union members and allege that union officials were made aware of this conduct in certain instances, Plaintiffs do not allege facts that would lead to the inference that the Union intended to discriminate against them by not pursuing grievances or having a policy of not pursuing grievances.  Of the twelve instances where Plaintiffs allege that the Union (a steward, or business agent) was aware of the discriminatory conduct, five of those instances are identified in the complaint as occurring beyond the time

4:20-cv-00585-CRK-CDL

permitted by the statute of limitations.[16]   Of the other seven instances, in none do Plaintiffs allege that a grievance was file.  None of the Plaintiffs allege that they filed a grievance for any of the incidents or that they were stopped from filing a grievance, let alone that there was a categorical decision to not pursue any grievances by the Union because of race.  See Goodman, 482 U.S. at 657.  In the one additional instance where the TAC alleges that an unnamed Black member filed a grievance when he was threatened, the TAC fails to give any factual information from which a jury could infer that the Union intended to discriminate.  There are no allegations concerning whether the Union failed to take any action or why no action was pursued.

---

[16]  In 2010, A Black member was verbally accosted by a White member then harassed by a foreman.  The Black member filed a grievance, but the Union took no action. TAC at ¶ 140a.  In 2014, Mr. McIntosh was struck in the eye by a rock thrown by a White union member.  McIntosh alleges "[a] complaint was filed over this conduct and the Union did nothing."  Id. at ¶ 140b.  It is unclear if the complaint was filed with the Union or the company or if the complaint was a grievance.  In 2014, Mr. McIntosh complained about White members using the N-word and was told that "if he didn't like it, he could quit."  Id. at ¶ 140:c.  He reported the incident to a White union business agent who told Mr. McIntosh "that there was nothing he could do about what happened."  Id.  Mr. McIntosh requested the union business agent and business manager to file a grievance and was told "No. I'm not going to file a grievance for you."  Id. at ¶ 140:c–d.  In 2007, Mr. McIntosh alleges he was fired on the pretextual basis that he failed to wear his safety gear.  Id. at ¶ 140:g.  "McIntosh denied [he was fired for failing to wear safety gear] and reported the termination to the Union Steward.  The Union Steward refused to take any action with Michels, refused to file a grievance, and instead moved McIntosh to another location."  Id. at ¶ 140:g.  In 2007 Mr. Jordan was threatened with a gun by a White Welder.  The welder was fired from the specific job site but not the Union, and the Steward took no other action.  Id. at ¶¶ 167, 168.

4:20-cv-00585-CRK-CDL

At several points, the TAC alleges that the Union refused to file a grievance, but it does so without supplying any factual content.[17] TAC at ¶¶ 111, 155, 159, 176, 195. The TAC alleges at many points that Plaintiffs believed that "pursuing a grievance would be futile." Id. at ¶ 205:m, see also id. at ¶ 176. As in prior complaints, Mr. Jones alleges that unions in general and Local 798 specifically have a history of discrimination against Black members. Id. at ¶¶ 14, 21, 25, 44–45, 68, 239, 247. At several points Plaintiffs allege that it was "well known" or "common knowledge" that the Union would not pursue grievances for Black members. Id. at ¶¶ 155, 159, 176, 195, 230.[18] However, such conclusory allegations are insufficient

---

[17] Mr. Jones alleges generally that he complained to "Stewards, Business Agents, Foremen, Supervisors and other Management within the Union and at the job site about the discriminatory conduct he was subjected to and observed." TAC at ¶ 108. Although he does not allege that he filed a grievance, he alleges that "[t]he Union Stewards refused to investigate his complaints and refused to pursue grievances on his behalf." Id. at ¶ 109.

[18] Plaintiffs attempt to refute Defendant's position that the Union lacked intent and therefore the claim should be dismissed by pointing to Malone v. Pipefitters' Ass'n Loc. 597, No. 97-C-3718, 1998 WL 433765 (N.D. Ill. July 29, 1998). That case is a pre-Twombly and pre-Iqbal district court case from the Northern District of Illinois where the court denied the union's motion to dismiss, finding that the complaint would be dismissed only if it "appears beyond doubt that he can prove no set of facts in support of his claim which would entitle him to relief." Malone, 1998 WL 433765, at *1. The Supreme Court has since made clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Likewise, Plaintiff's citation to Burkes v. Holder, 953 F. Supp. 2d 167, 179 (D.D.C. 2013) is inapposite. Burkes describes a situation in which an employee of the FBI displayed a stuffed monkey hanging from a noose in a public work area within the FBI office. Burkes, 953 F. Supp. 2d at 170. The district court, ruling on the motion to dismiss, held that the plaintiff had pled "sufficient factual matter" to proceed to discovery on his race-based hostile work environment. Id. at 179. In Burkes, the egregious racist action by an employee was sufficient to establish his intent. Id. Although the overtly racist image was sufficient to establish intent of the employee, it does not follow that any instance of overtly racist expression by another union member is sufficient to establish discriminatory intent of the Union.

to survive a motion to dismiss.  See Williams v. Lousiana ex rel. Dep't of Pub. Safety & Corrs., No. 22-30385, 2023 WL 2366980, at *1−2 (5th Cir. 2023) (holding that the plaintiff's claim that there is "common knowledge" without additional statistics or specific allegations to support a discrimination claim does not constitute a sufficient pleading of discrimination based on race).[19]

Plaintiffs argue they have raised a plausible claim because all that is needed is the allegation that the "Union maintained a policy of refusing to address or arbitrate their racial discrimination claims."  Pls. Resp. at 21 (citing Dillard v. SEIU Loc. 32BJ, No. 15-CIV-4132-CM, 2015 WL 6913944, at *8 (S.D.N.Y. Nov. 6, 2015)). Plaintiffs continue they "allege exactly that," and then highlight conclusory allegations contained in the TAC.  See id. at 21 (citing TAC at ¶ 48:h) (alleging policy of refusing to pursue grievances on behalf of Black members in the same manner as White members); id. at ¶ 87 (claiming the Union failed to impose consequences, including through grievances, on racist White members).[20]  The Court cannot presume the truth of conclusory allegations.  See Khalik, 671 F.3d at 1191.  Plaintiffs fail to allege facts which could plausibly support a claim that the Union intended to

[19] Plaintiffs argue that intent can be inferred from the "100 [percent] statistical disparity between the number of the jobs held by White and Black Union members." Pls. Resp. at 16.  Plaintiffs cite United States v. Pennsylvania, 110 F. Supp. 3d 544, 553 (M.D. Pa. 2015) to argue that "[t]he statistical evidence needed to survived (sic) a motion to dismiss need not even be detailed."  See id.  Plaintiffs' citation to this case is inapposite, as it was a Title VII disparate impact claim, a claim that the Plaintiffs here have abandoned.  TAC at ¶ 208:h n.8.
[20] Plaintiffs also rely on an allegation in the complaint involving an entirely different case in another jurisdiction.  Pls. Resp. at 21 (citing TAC at ¶ 34) (alleging Union failed to represent Black employee in his grievance).

not enforce the CBA because of race.  Therefore, Plaintiffs first claim for failing to enforce the terms of the CBA under 42 U.S.C. § 1981 must be dismissed.

### B.    Failure to Promote Under 42 U.S.C. § 1981 (Count II)

Plaintiffs allege that the Union intentionally prevented them from advancing within the Union.  TAC at ¶¶ 55, 60, 71, 94, 96, 102, 107, 151, 172.  The Union argues that it took no purposeful action to discriminate against Plaintiffs in their quest to advance, and that Plaintiffs fail to allege facts of an such actions.  Def. Mot. at 16–17.

Typically, a failure to promote case requires a plaintiff to allege (1) he is a member of a protected group; (2) he was qualified and applied for a promotion to an available position; (3) he was rejected; and (4) similarly situated employees, not part of the protected group received the promotion instead.  See Castille v. Teletech Customer Care Mgmt. (Co.), 56 F. App'x 895, 897 (10th Cir. 2003) (requiring the plaintiff to prove that she was intentionally discriminated against by her employer based on her race); see also Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996) (explaining the factors for failure-to-promote claim).[21]  To prevail under Section 1981 with respect to the facially neutral requirements imposed by a union, the plaintiff must establish that the requirements were the product of a racially discriminatory intent.  Washington v. Davis, 426 U.S. 229, 240–41 (1976).

---

[21] In failure to promote cases, both Title VII, and Section 1981 adopt the same framework.  Bryant v. Aiken Regional Medical Centers Inc., 333 F.3d 536, 543–44 (4th Cir. 2003), cert. denied 540 U.S. 1106 (2004).

4:20-cv-00585-CRK-CDL

Here, Plaintiffs allege no facts from which a jury could plausibly infer that the Union intentionally imposed advancement requirements or otherwise interfered with Plaintiffs' advancement because of their race.  Plaintiffs ask the Court to infer that because Plaintiffs—specifically Mr. Jones, Mr. Ball and Mr. Taylor[22]—did not receive the required letters in support of their application from other union members or never asked for letters because they did not think they would be supplied, that the Union used the requirement as a pretext to prevent their advancement.  See TAC at ¶¶ 65:c, 66:b, 68, 90, 92–94, 120, 239.  Plaintiffs do not allege any facts that would support this inference.

Mr. Jones alleges that, to satisfy the Union's advancement requirements, he requested letters from more than ten individuals.  Id. at ¶ 94.  The allegations continue that "[t]o his knowledge, none of them bothered to complete the form for him, despite his diligent follow up."  Id.  Mr. Jones alleges that "Welders and Journeymen frequently complete letters of recommendation to assist in the advancement within the union of White Helpers."  Id.  Likewise, his claims of discriminatory treatment in advancement are conclusory.  He alleges the welding school "frequently assists and admits White union members who seek advancement within the union." Id. at ¶ 95.

---

[22]  The TAC alleges, without factual content, that various members knew it would be futile to try to advance, TAC at ¶¶ 149, 157, 185, 197, and states in conclusory language that Local 798 imposes job advancement requirements to ensure Black members will not advance while not holding White members to the same requirements.  Id. at ¶¶ 60, 69, 72, 74.

4:20-cv-00585-CRK-CDL

Plaintiffs Ball and Taylor allege similar treatment.  Mr. Ball alleges that although he was a helper for his entire membership with Local 798, he was allowed to work as a Journeyman when working with other local unions.  Id. at ¶ 145.  Both he and Mr. Taylor claim they never had the opportunity to work a full 2080 hours per year, id. at ¶¶ 148, 150, 184, and that they were often the only Black Helpers on a job site.  Id. at ¶ 148, 186.   Moreover, "[f]or a year prior to leaving the Union [Taylor] was unemployed while White Helpers with the same or less experience were hired over him for jobs."  Id. at ¶ 198.

Plaintiffs allege sufficient facts from which a jury could conclude that they tried to advance and that their efforts were unsuccessful, but then make only conclusory allegations regarding the Union's intent.  Id. at ¶ 60 (asserting the Union "has imposed job advancement requirements that it knows Black union members will not be able to meet because it intentionally ensures Black members will not meet or complete the requirements").  Without more, such allegations are insufficient to survive a motion to dismiss.  See Twombly, 550 U.S. 544 (2007); Frey, 41 F.4th at 1233.  Accordingly, Count II in the TAC must be dismissed.

### C.   Unequal Terms and Conditions of Employment Under 42 U.S.C. § 1981 (Count IV)

Plaintiffs allege that they were treated less favorably than White members in regard to the terms and condition of employment.  Plaintiffs bring this claim pursuant to Section 1981 which, as discussed, guarantees all people the right "to make and enforce contracts" and "the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  Typically, an allegation of unequal

37

4:20-cv-00585-CRK-CDL

terms and conditions of employment arises under Title VII, which proscribe employment practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In the Title VII context, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Alamo v. Bliss, 864 F.3d 541, 549 (7th Cir. 2017) (quoting Harris v. Forklift Sys. Inc., 510 U.S. 17, 21, (1993)).

Here, Plaintiffs have not exhausted remedies with respect to any claim of unequal conditions and terms of employment under Title VII. Plaintiffs fail to explain exactly how or why they have plausibly set forth a claim for this count added in the TAC. Plaintiffs do not respond to Defendant's arguments raised in its motion to dismiss, which argues that "Plaintiffs lack any factual support for the conclusory allegation that Local 798 denies equal terms and conditions or treats the Plaintiffs less favorably based on race." Def. Mot. at 19. Defendant further argues that "[t]he Union is not alleged to be responsible for the employer's decision because this decision is reserved to the employer." Id. at 20. Defendant continues that "[j]ust like the hostile work environment claim, this claim is misdirected and cannot be raised against the Union as it complains of employer management actions." Id.

The Court can only assume that Plaintiffs seek to argue that the Union intentionally (i) assists employers in discriminatory decisions regarding the

38

assignment of hours, classification, discipline, hiring and termination of employees; or (ii) creates or allows a hostile work environment that affects the conditions of employment. Whatever Plaintiffs are trying to argue, they need to demonstrate intent. If Plaintiffs brought this claim under Title VII, they may have been able to allege disparate impact of unequal terms and conditions, Carpenter v. Boeing Co., 456 F.3d 1183, 1186–87 (10th Cir. 2006), but Plaintiffs have not done so. Instead, Plaintiffs assert this claim under Section 1981 which, as discussed, requires that Plaintiffs allege intent to discriminate.

Plaintiffs must allege that the Union intended to treat Black members less favorably than White workers in regard to the terms and condition of employment. See York, 95 F.3d at 956–57. Although the TAC alleges racist and abhorrent conduct on behalf of a number of union members, it lacks sufficient allegations of fact to attribute this behavior to the Union. Although the TAC asserts that the Union intended to treat Black members less favorably, it only does so with conclusory allegations which are not presumed to be true for the purposes of this motion. See TAC at ¶¶ 161, 162, 178, 179. Accordingly, Plaintiffs' fourth claim must be dismissed.

### D.   Hostile Work Environment Under 42 U.S.C. § 1981 (Count V)

Plaintiffs also claim the Union subjected the Plaintiffs to "severe and pervasive hostile work environment harassment on the basis of their race, at every Local 798 job site." TAC at ¶ 272–76. To successfully plead a prima facie hostile work environment claim, a plaintiff must allege facts from which a jury could infer that he: (1) is a member of a protected group; (2) was subject to unwelcome harassment; (3)

the harassment was based on race; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of his employment and created an abusive working environment. 42 U.S.C. § 1981; Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007) (citing Dick v. Phone Directories Co., 397 F.3d 1256, 1262 (10th Cir. 2005));

Again, as in the case of Count I, Plaintiffs must plead intent, and specifically that the Union intended to harass them because of their race. Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982) (holding that "Section 1981 can be violated only by intentional discrimination"); Durham v. Xerox Corp., 18 F.3d 836, 838–39 (10th Cir. 1994) (stating standards and burdens under Section 1981 are the same as those under Title VII and require evidence of discriminatory intent). The TAC alleges several disturbing instances which recount racist and vile behavior of other union members. However, and accepting those allegations as true, they are insufficient to allege an intent by the Union to create a hostile working environment. The allegations accepted as true establish that individual union members exhibited abhorrent racist conduct, and that at least some stewards and business agents were aware of such conduct but took no action. TAC at ¶¶ 79–80, 139:a–d, 140:a–e, 140:g.

These allegations are insufficient to support a claim against the Union. Mere inaction is not sufficient to demonstrate intent. York, 95 F.3d at 956–57. Although, a categorical decision to not pursue the grievances of Black union members renders a union liable for discrimination, Goodman, 482 U.S. at 668, here, the Court cannot conclude that Plaintiffs have stated a claim when they do not even allege that they

4:20-cv-00585-CRK-CDL

filed grievances. See e.g., Thorn, 305 F.3d at 832–33 (holding that because employee did not ask union to file a grievance, union had no duty to remedy sexual harassment.); Patel v. Albano, No. 97-CIV-6780-RPP, 1998 WL 726475, at *3 (S.D.N.Y. Oct. 13, 1998) (ruling the complaint failed to state a claim because at no point did it allege that the plaintiff file a formal grievance with the union); Douglass, 368 F. Supp. 2d at 1247  (holding that the plaintiff  failed in her burden to provide specific facts showing that a genuine issue for trial existed when she never attempted to file any grievance with regard to her job placements); Badlam, 46 F. Supp. 2d at 201 (finding that the union was under no obligation to take further action because the plaintiff did not pursue a grievance regarding her sex discrimination accusations); Anjelino, 200 F.3d at 95–96 (holding union was not liable for discrimination because it did not instigate or actively support the discrimination and the employer was responsible for assigning work and ensuring a discrimination-free workplace); Chrysler Corp., 173 F.3d at 703–04 (stating a labor organization is liable for an employer's discrimination in the workplace if it "causes or attempts to cause the employer to discriminate," or if the union "purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer" (first citing 42 U.S.C. § 2000e-2(c)(3); and then quoting Hardison v. Trans World Airlines, Inc., 527 F.2d 33, 42–43 (8th Cir.1975), rev'd on other grounds, 432 U.S. 63 (1977))).  Therefore, Plaintiffs' hostile work environment claim under 42 U.S.C. § 1981 must be dismissed.

4:20-cv-00585-CRK-CDL

### III.   Failure to Enforce the CBA Under Title VII (Count III)

Plaintiffs allege that the Union failed to enforce their rights under Title VII. TAC at ¶¶ 254–65.   As a threshold matter, Plaintiffs must first exhaust their remedies under Title VII to seek redress before this Court.   Aramburu v. Boeing Co., 112 F.3d 1398, 1409 (10th Cir. 1997); Edwards v. Creoks Mental Health Servs., Inc., 505 F. Supp. 2d 1080, 1092 (N.D. Okla. 2007) (citing Aramburu, 112 F.3d at 1409); see also Alcivar v. Wynne, 268 F. App'x 749, 753 (10th Cir. 2008) (explaining that exhaustion is a jurisdictional prerequisite in the Tenth Circuit for Title VII claims and that "the district court must always dismiss if there has been a failure to exhaust" (emphasis omitted)).   The only Plaintiff to have done so here is Mr. Jones.[23]   See TAC at ¶ 13.   However, Mr. Jones has not added any new factual content in the TAC to support his Title VII claim of disparate treatment.

To establish a prima facie Title VII claim against a union for a disparate treatment, a plaintiff must allege intent.   See E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 773 (2015); Ricci v. DeStefano, 557 U.S. 557, 577 (2009).   As previously stated in Jones II, "Title VII recognizes two types of claims: disparate

---

[23] To exhaust administrative remedies, a "claimant must first file an administrative charge; only the claims contained in the charge or those that are like or reasonably related to the allegations of the charge can be raised in a Title VII lawsuit." Beyene v. Hilton Hotels Corp., 815 F. Supp. 2d 235 (D.D.C. 2011), aff'd, 573 F. App'x 1 (D.C. Cir. 2014) (internal citations and quotations omitted).   Here, Mr. Jones exhausted administrative remedies for his failure to enforce the CBA claim under Title VII. Plaintiffs claim that Mr. Jones' exhaustion extends to the class presumably because Plaintiffs argue there is a pattern or practice and thus Plaintiffs "reserve their right to amend their pleading to assert a disparate impact claim, once administrative exhaustion is completed." TAC at ¶ 208:h n.8.

treatment and disparate impact." 2023 WL 3666090, at *6 (citing Carpenter, 456 F.3d at 1186–87). For a disparate treatment claim, the plaintiff must allege intent to discriminate. Abercrombie & Fitch Stores, Inc., 575 U.S. at 773. Disparate treatment under Title VII requires the same elements as disparate treatment under 42 U.S.C. § 1981. See Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 1991) ("in racial discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII"); Jones II, 2023 WL 3666090, at *6. To establish a prima facie case for racial discrimination under Title VII, a plaintiff plead facts from which a jury could infer that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. Duran v. LaFarge N. Am., Inc., 855 F. Supp. 2d 1243, 1249 (D. Colo. 2012).

Here, again, Mr. Jones fails to allege sufficient facts from which a jury could plausibly infer that the Union failed to enforce his rights because the Union was motivated by discriminatory animus. Mr. Jones allegations identify discriminatory acts by individuals other than Local 798 of which the Union was aware, but it does not allege facts from which am inference could be drawn that the Union intended to discriminate against Mr. Jones. Mr. Jones alleges no new facts that, if proven, would plausibly make out a claim that the Union had the requisite intent for a disparate

impact claim. [24]   Therefore, and consistent with the Court's reasoning in <u>Jones II</u>, Count III must be dismissed.

## IV.   The Third Amended Complaint is Dismissed with Prejudice

This is the third motion to dismiss that the Court has considered in this matter. The two preceding motions were granted without prejudice; thus, Plaintiff was permitted to amend.  Order, Dec. 5, 2022, ECF No. 40; Order, May 25, 2023, ECF No. 54.  Defendant requests that the Court dismiss the TAC with prejudice because further amendment would be futile.  Def. Mot. at 13; <u>see also</u> <u>Brereton v. Bountiful City Corp.</u>, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile").  Despite having three chances, Plaintiffs fail to allege facts sufficient with which to withstand a motion to dismiss.  Where there has been the "repeated failure to cure deficiencies by amendments previously allowed" the Court may conclude that it would be futile to allow further amendment.  <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962) (acknowledging that further amendment may be denied where there is "repeated failure to cure deficiencies by amendments previously allowed"); <u>Mountain View Pharmacy v. Abbott Lab'ys</u>, 630 F.2d 1383, 1389

---

[24]  As noted by Defendant, Plaintiffs cite <u>Cole v. Appalachian Power Co.</u>, No. 1:94-0517, 1995 WL 370400 (S.D.W. Va. May 19, 1995) to claim "the Union knew what was happening and did nothing to stop it." Def. Mot. at 5; Pls. Resp. at 25.  Defendant argues that Plaintiff's reliance on the case is misplaced.  Defendant is correct, as the court in that case found that the plaintiff's complaint was subject to dismissal because the plaintiff failed to exhibit facts that could lead to the inference that the defendant union "directed, induced, authorized or ratified any acts" as required by Title VII. <u>Cole</u>, 1995 WL 370400, at *3.

(10th Cir. 1980) (dismissing the plaintiffs' claims with prejudice after they were given "ample opportunity to present a legally sufficient pleading by means of the original complaint"). Therefore, the TAC is dismissed with prejudice.

## V.    The Class Action

In addition to his individual claims Plaintiffs purport to seek relief on behalf of "all others similarly situated[.]" TAC ¶ ¶ 253, 263. However, class action claims cannot survive when the named plaintiffs' claims have been dismissed. Robey v. Shapiro, Marianos & Cejda, L.L.C., 434 F.3d 1208, 1213 (10th Cir. 2006) (dismissing class action claims because the plaintiff's individual claims were dismissed); Parrish v. Arvest Bank, 717 F. App'x 756, 760 (10th Cir. 2017) (reiterating the standard from Robey); Sample v. Aldi Inc., 61 F.3d 544, 551–52 (7th Cir. 1995) (holding that because the district court properly disposed of the plaintiff's individual claims, he "cannot represent a class"), disapproved on other grounds, Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996). Given that Plaintiffs' claims are dismissed, the claims of the class are likewise dismissed.

## CONCLUSION

Plaintiffs have failed to allege sufficient facts from which a jury could plausibly infer that the Union intended to discriminate against them in order to sustain a cause of action under either 42 U.S.C. § 1981 or 42 U.S.C. § 2000e. It is evident from the repeated efforts that allowing Plaintiffs to amend their complaint again would be futile.

In light of the foregoing, it is

**4:20-cv-00585-CRK-CDL**

**ORDERED** that Defendant's motion to dismiss, <u>see</u> ECF No. 61, is granted; and it is further

**ORDERED** that Plaintiffs' claims under 42 U.S.C. § 1981 are dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) because further amendment would be futile; and it is further

**ORDERED** that Plaintiffs' Title VII claim is dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) because further amendment would be futile.

<u>/s/ Claire R. Kelly</u>
Claire R. Kelly, Judge[*]

Dated:     March 26, 2024
           New York, New York

---

[*] Judge Claire R. Kelly, of the United States Court of International Trade, sitting by designation.